2005 WY 132 ·

**John Michael GRISSOM, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Defendant).**

**No. 04–154.**

Supreme Court of Wyoming.

Oct. 13, 2005.

Representing Appellant: Ken Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; and Marion Yoder, Senior Assistant Public Defender.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; Eric Johnson, Director, Prosecution Assistance Program; and Jenny L. Craig, Student Director.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶1] In February 2004, a Natrona County jury found John Michael Grissom (the

appellant) guilty of three crimes: possession of methamphetamine (a misdemeanor); possession of marijuana (a misdemeanor); and possession of methamphetamine with the intent to deliver (a felony). The appellant now appeals those convictions, claiming that his trial counsel were ineffective because they did not file a suppression motion and that the evidence received at trial was insufficient to prove that he intended to deliver the methamphetamine in his possession. We affirm.

## ISSUES

1. Whether the appellant's trial counsel were ineffective because they did not file a motion to suppress the evidence seized from the appellant's person?

2. Whether the appellant's trial counsel were ineffective because they did not file a motion to suppress the appellant's statements to law enforcement?

3. Whether the evidence was sufficient to prove that the appellant intended to deliver the methamphetamine in his possession?

## FACTS

[¶2] On September 19, 2003, Stephanie Syverson (Syverson) "attempted to run over an officer" (presumably a law enforcement officer) near the Eastridge Mall in Casper and was therefore "wanted for allegations of committing a felony...." An employee at a local hotel informed the police later that day that a vehicle matching the description of Syverson's vehicle was parked at the hotel, and that the employee had observed a female enter the vehicle and then return to a particular hotel room. Casper police officer Roger Burns was dispatched to the hotel at about 3:00 or 3:30 p.m., where he verified with the front desk that the hotel room at issue was indeed registered to Syverson. Casper police officer Toby Buhler also arrived at the hotel and observed the subject vehicle in the hotel parking lot.

[¶3] The ground-floor hotel room registered to Syverson had both a door that opened into the hotel and a door that opened into the hotel parking lot. The officers de-

cided that Officer Buhler would enter the hotel and watch the door that opened into the hotel "so nobody ... would leave and so no one attempted to make contact from the outside" and that Officer Burns would exit the hotel and watch the door that opened into the hotel parking lot.

[¶4] Officer Buhler, who was familiar with Syverson from previous contacts, entered the hotel and spotted Syverson ahead of him in the hallway relatively close to her room door. Syverson turned and looked back, but the officer "played dumb" by staring into the hotel's office windows because he was worried that Syverson would dash into her room, shut the door, and thereby complicate the officer's objectives. Syverson went two or three more steps and entered her hotel room. Officer Buhler waited in the alcove of the hotel room adjacent to Syverson's room, suspecting that she would look through her door's "spy hole" to see whether the officer passed by her room and continued down the hallway, or instead came to her door. The officer figured that Syverson's curiosity would overcome her and she would ultimately open the door and look for the officer.

[¶5] Syverson eventually opened her door, looked down the hallway, and Officer Buhler "rushed her." Syverson tried to run back into her hotel room and slam the door, but the officer wedged his feet between the door and the door frame and attempted to push and squeeze his way into the hotel room. As he was struggling to keep the door open, Officer Buhler saw Syverson on the opposite side of the door (nearly horizontal in her attempt to push the door closed), another female sitting on a bed, and the appellant in the back of the room. As soon as the appellant saw the officer coming through the door, the appellant exhibited a "look of fear in his face," grabbed something that was on a table, and ran out the room's other door into the hotel parking lot. At some point, Syverson relented and backed away from the room's interior door.[1]

[¶6] Meanwhile, Officer Burns was conferring with Casper police sergeant Chris Hadlock outside the hotel room when the

1. Officer Buhler testified that he did not have a warrant to enter into the room.

appellant suddenly ran out of the room, saw the officers, and ran the opposite direction. Officer Burns pursued the appellant, who stopped approximately fifty to one-hundred feet from the hotel room and put his hands up in the air. The officer "took [the appellant] down to the ground so he didn't take off running on [the officer] or have a chance to fight with [the officer]...." Upon observing a sheathed eight-inch hunting knife attached to the belt on the appellant's hip, Officer Burns handcuffed him for safety reasons and proceeded to pat him down for additional weapons. The officer wanted to find out who the appellant was, why he ran, and whether he was the subject of any outstanding arrest warrants. When Officer Burns asked the appellant for his name and identification, the appellant was cooperative, provided his name, and indicated that his identification was in his wallet. The officer ultimately arrested the appellant because he was the subject of an outstanding arrest warrant.

[¶ 7] When he was arrested, the appellant was wearing a fanny pack around his waist. The following items were, at some point, seized from the fanny pack and/or the appellant's person: (1) a small digital scale containing a white powder residue Officer Burns suspected was methamphetamine; (2) eight small baggies with a white powder residue that a forensic chemist later testified was methamphetamine; (3) two small baggies, each with a substance containing tetrahydrocannabinol (the active ingredient in marijuana); (4) a small plastic container with methamphetamine residue; (5) a spoon containing methamphetamine residue; (6) five empty syringes; (7) two razor blades; (8) a glass methamphetamine pipe, and a brass marijuana pipe; (9) various other baggies, some of which baggies appeared to contain an unidentified residue and 112 of which baggies appeared to be unused; (10) an address book and a phone number book; (11) business cards and numerous pieces of paper in a small notebook; and (12) a cell phone. A forensic chemist testified that the total

weight of the substances that contained methamphetamine was 1.39 grams.

[¶ 8] Officer Burns placed the appellant in the back seat of a patrol vehicle, whereupon the appellant indicated that he wanted to talk to DCI (the Wyoming Division of Criminal Investigation). A call was placed to DCI and Natrona County deputy sheriff Keith Wilhelm (who was at that time assigned to DCI's drug task force) arrived at the scene shortly thereafter. Deputy Wilhelm located the appellant in Officer Burns' patrol vehicle and read him his *Miranda* rights. According to Deputy Wilhelm, the appellant indicated that he understood his rights and that he wanted to waive those rights and make a statement. The appellant then stated: (1) that he had purchased two grams of methamphetamine "about an hour" before the police arrived at the hotel; (2) that he was very familiar with Syverson;[2] (3) that he knew she was staying in the hotel room; (4) that he went there to "get high, to party;" (5) that he had been in the hotel room for fifteen minutes before the police arrived; and (6) that he had already arranged to purchase a quarter-ounce of methamphetamine later that afternoon and trade it to another individual.

[¶ 9] The appellant was charged with: (1) possession of methamphetamine with the intent to deliver, a felony in violation of Wyo. Stat. Ann. § 35–7–1031(a)(i) (LexisNexis 2003); (2) possession of methamphetamine, a misdemeanor in violation of Wyo. Stat. Ann. § 35–7–1031(c)(i); and (3) possession of marijuana, a misdemeanor in violation of Wyo. Stat. Ann. § 35–7–1031(c)(i). On February 19, 2004, a Natrona County jury found the appellant guilty of all three charges. The district court sentenced the appellant to imprisonment for eight to twelve years for the felony conviction and also imposed sentences for the misdemeanor convictions. The appellant now appeals from the district court's judgment and sentence.

---

2. About two weeks prior to this incident, the appellant offered to serve as a confidential informant for Deputy Wilhelm. The appellant attempted to set up drug buys with several individuals, including Syverson; however, after two or three days, the appellant failed to keep in contact with or meet Deputy Wilhelm and the officer terminated the appellant as a confidential informant.

## DISCUSSION

### *Ineffective Assistance of Counsel*

[¶ 10] Two public defenders represented the appellant at trial. On appeal, the appellant asserts that his trial counsel were ineffective because they did not file a motion to suppress the evidence seized from the appellant's person (essentially the contents of the appellant's fanny pack) or the statements the appellant made to law enforcement.

### Standard of Review

[¶ 11] Claims of ineffective assistance of counsel are reviewed under the following standard:

"When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Herdt v. State*, 891 P.2d 793, 796 (Wyo. 1995); *Starr v. State*, 888 P.2d 1262, 1266–67 (Wyo.1995); *Arner v. State*, 872 P.2d 100, 104 (Wyo.1994); *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986). The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Herdt*, at 796; *Starr*, at 1266; *Arner*, at 104; *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

Under the two-prong standard articulated in *Strickland* and *Frias*, an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Starr*, at 1266; *King v. State*, 810 P.2d 119, 125 (Wyo.1991) (Cardine, J., dissenting); *Campbell v. State*, 728 P.2d 628, 629 (Wyo.1986); *Frias*, 722 P.2d at 145. In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to 'render such assistance as would have been offered by a reason-

ably competent attorney' and that 'counsel's deficiency prejudiced the defense of the case.' *Lower v. State*, 786 P.2d 346, 349 (Wyo.1990). 'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064."

*Asch* [*v. State*, 2003 WY 18, ¶ 11, 62 P.3d 945, 950 (Wyo.2003) ] (*quoting Becker v. State*, 2002 WY 126, ¶ 12, 53 P.3d 94, ¶ 12 (Wyo.2002); *Reyna v. State*, 2001 WY 105, ¶ 19, 33 P.3d 1129, ¶ 19 (Wyo.2001); *Chapman v. State*, 2001 WY 25, ¶ 6, 18 P.3d 1164, ¶ 6 (Wyo.2001); *Grainey v. State*, 997 P.2d 1035, 1038–39 (Wyo.2000)). The burden of proving that counsel was ineffective rests entirely on an appellant. *Asch*, at ¶ 11 (citing *Barkell v. State*, 2002 WY 153, ¶ 10, 55 P.3d 1239, ¶ 10 (Wyo.2002)). To satisfy his burden, an appellant must provide more than mere speculation or equivocal inferences. *Sincock v. State*, 2003 WY 115, ¶ 37, 76 P.3d 323, ¶ 37 (Wyo.2003) (citing *Barkell*, at ¶ 13).

*Duke v. State*, 2004 WY 120, ¶ 36, 99 P.3d 928, 943 (Wyo.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 2513, 161 L.Ed.2d 1113 (2005).

[¶ 12] We have further stated that an appellant

"must demonstrate the existence of a reasonable probability that, absent that deficiency, the result of the proceedings would have been different. Counsel's ineffectiveness must be so serious as to undermine this court's confidence that the outcome was fair. *Laing v. State*, 746 P.2d 1247, 1248–49 (Wyo.1987); *Gist v. State*, 737 P.2d 336, 342 (Wyo.1987); *Frias v. State*, 722 P.2d 135, 145–47 (Wyo.1986)."

*Rutti v. State*, 2004 WY 133, ¶ 23, 100 P.3d 394, 405 (Wyo.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1990, 161 L.Ed.2d 858 (2005) (*quoting Lower v. State*, 786 P.2d 346, 349–50 (Wyo.1990)). When ineffective assistance of counsel is alleged due to counsel's failure to file a suppression motion, "[p]rejudice to a defendant can only be shown where, had the

motion been made, it would have been granted, and had the evidence been suppressed, ' "only a limited amount of evidence was available to the prosecution to support a conviction." ' " *Page v. State*, 2003 WY 23, ¶ 8, 63 P.3d 904, 909 (Wyo.2003), *abrogated on other grounds by TJS v. State*, 2005 WY 68, 113 P.3d 1054 (Wyo.2005) (*quoting Lancaster v. State*, 2002 WY 45, ¶ 59, 43 P.3d 80, 102 (Wyo.2002) and *Dickeson v. State*, 843 P.2d 606, 612 (Wyo.1992)).

[¶ 13] A failure to "make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland v. Washington*, 466 U.S. 668, 700, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Indeed, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697, 104 S.Ct. 2052.

**Evidence Seized from the Appellant's Person**

[¶ 14] The appellant first argues that his trial counsel were ineffective because they did not file a motion to suppress the evidence seized from his person. The appellant's argument focuses on whether Officer Buhler's entry into the hotel room at issue was reasonable or lawful. According to the appellant, that entry improperly created an exigency which then "precipitated the emergence of [the appellant], an admitted drug user, from that motel room, his warrantless seizure and the warrantless search and seizure of his person and personal effects;" in

other words, because of the appellant's trial counsel's "failure to challenge the constitutionality of the police's clearly non-consensual, warrantless entry [into the hotel room], the fruits stemming from the police's improper conduct came [into evidence at trial] without opposition." The State asserts that the appellant has not demonstrated that he had a reasonable expectation of privacy in the hotel room and that the appellant therefore cannot challenge the legality of Officer Buhler's warrantless entry into the hotel room.[3]

[¶ 15] The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.[4] *Vassar v. State*, 2004 WY 125, ¶ 13, 99 P.3d 987, 992–93 (Wyo.2004). However, the "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). *See also Putnam v. State*, 995 P.2d 632, 636 (Wyo.2000). "The burden of proving that a reasonable expectation of privacy exists is on the proponent of a motion to suppress." *Id.* at 636.

[¶ 16] We have previously considered the merits of an appellant's capacity to allege a Fourth Amendment violation within the rubric of an ineffective assistance of counsel claim. *See, for example, Beadles v. State*, 984 P.2d 1083, 1086 (Wyo.1999). The appellant in the instant case clearly anticipated the issue because it is referenced in his principal appellate brief. He acknowledges in that brief that his capacity "to assert privacy

---

3. We note that the United States Supreme Court has stated that in "determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.' " *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (*quoting Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). *See also United States v. Gordon*, 168 F.3d 1222, 1225–26 n. 2 (10th Cir.), *cert. denied*, 527 U.S. 1030, 119 S.Ct. 2384, 144 L.Ed.2d 786 (1999).

4. The appellant cursorily references the Wyoming Constitution in his appellate brief, but does

not present an independent state constitutional analysis; a failure to present such an analysis limits our consideration to federal constitutional principles. *Vassar v. State*, 2004 WY 125, ¶ 14, 99 P.3d 987, 993 (Wyo.2004). The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

rights in the motel room, and especially his own rights to be free from unreasonable seizure and search, necessarily involve fact-intensive inquiries," but takes the following position regarding the trial record in the instant case:

> In this case, Mr. Grissom may well have had to show his "standing" to assert a Fourth Amendment privacy interest in Ms. Syverson's motel room. . . . From the few facts available on the record, *nothing can be determined with certainty about Mr. Grissom's privacy interests (and the right not to be barged in upon in Ms. Syverson's room),* but it cannot be baldly assumed, from the few facts given at trial, that he had no such rights. Had suppression been sought to explore this point, standing testimony Mr. Grissom might have given at a hearing on it could not have been used against him at trial even if he lost on the standing issue.

(Emphasis added.) The State ultimately did raise the issue in its appellate brief,[5] but the appellant did not file a reply brief. Interestingly, the appellant's appellate counsel further stated at oral argument that "had there been a suppression motion filed, we would have some evidence in the record to show whether or not [the appellant] had standing to assert a right to privacy in that hotel room, but we don't have any of that information" and "there is not enough in the record to make a standing argument."

[¶ 17] It is the appellant's burden to prove that his trial counsel were ineffective and that he was prejudiced by his trial counsel's alleged ineffectiveness. When that alleged ineffectiveness is due to the failure to file a suppression motion, the appellant must show that if such a motion had been made, it would have been granted. The State ques-

tions whether the appellant had the capacity to challenge Officer Buhler's entry into the hotel room at issue. It is therefore incumbent upon the appellant to demonstrate that he had a legitimate expectation of privacy in that hotel room. The appellant has essentially conceded on appeal that he cannot do so from the record currently before us, so we need not consider the issue further.[6] *See Olsen v. State,* 2003 WY 46, ¶ 81, 67 P.3d 536, 567 (Wyo.2003) ("ineffectiveness claim should not be brought on appeal where the trial record is insufficient to determine the claim") and *Beadles,* 984 P.2d at 1086 (Beadles had no reasonable expectation of privacy in area searched and counsel was therefore not ineffective in failing to pursue a "previously filed motion to suppress evidence"—"counsel was not ineffective in declining to pursue an argument which must fail").

[¶ 18] In what amounts to a one-sentence argument in his appellate brief, the appellant further contends that the "State should have been required to show why [the appellant's] exit [from the hotel room] gave [law enforcement] cause to tackle him, and why anything beyond a *Terry* stop could have legally been made when he did bolt from it." The appellant also states in passing that law enforcement did not have probable cause to arrest him. This argument can hardly be deemed cogent, and we have "consistently held that we will not consider claims unsupported by cogent argument. . . ."[7] *Barkell v. State,* 2002 WY 153, ¶ 32, 55 P.3d 1239, 1245 (Wyo. 2002).

### The Appellant's Statements to Law Enforcement

 [¶ 19] The appellant contends that his trial counsel were also ineffective because they did not file a motion to sup-

---

5. Because the appellant is claiming that his trial counsel were ineffective for not filing a suppression motion, this appeal was obviously the State's first opportunity to raise the issue. The appellant does not contend that the State should be precluded from raising the issue in the instant case.

6. We note that the appellant did not request a remand for an evidentiary hearing to develop the record pursuant to *Calene v. State,* 846 P.2d 679 (Wyo.1993) (wherein, as we said in *Hornecker v.*

*State,* 977 P.2d 1289, 1291 (Wyo.1999), we "described in detail the procedures that are available in bringing an ineffective assistance of counsel claim where the deficiencies of counsel are not apparent on the face of the record").

7. Aside from challenging Officer Buhler's entry into the hotel room, the appellant does not otherwise offer any compelling argument in his appellate brief regarding the propriety of the search of his fanny pack.

press his statements to law enforcement. The appellant claims that he was arrested at "the moment he was taken to the ground by Officer Burns" and that he then made incriminating statements to Officer Burns and Sergeant Hadlock without having been advised of his *Miranda* rights. According to the appellant, the subsequent statements he made to Deputy Wilhelm (who testified that he did advise the appellant of his *Miranda* rights) were therefore "fatally tainted by the unwarned preceding statements he made while 'in custody.'"

Statements made by a suspect during custodial interrogation are admissible into evidence, providing certain advisements are made. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Statements made during custodial interrogation must be excluded upon a showing that the defendant was not advised of his *Miranda* rights. *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), *cert. denied*, 535 U.S. 1106, 122 S.Ct. 2315, 152 L.Ed.2d 1069 (2002). In *Dickerson*, 530 U.S. at 435, 120 S.Ct. 2326, the United States Supreme Court stated:

"Accordingly, we laid down 'concrete constitutional guidelines for law enforcement agencies and courts to follow.' ... Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as '*Miranda* rights') are: a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'"

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. *See also Glass v. State*, 853 P.2d 972, 976 (Wyo.

1993) and *Wunder v. State*, 705 P.2d 333, 334 (Wyo.1985). Neither general on-the-scene questioning as to facts surrounding a crime nor statements volunteered freely without compelling influences are considered to fall within this definition. *Miranda*, 384 U.S. at 477–78, 86 S.Ct. 1602.

...

The giving of *Miranda* warnings, by itself, does not suffice to render a statement admissible. The Fifth and Fourteenth Amendments to the United States Constitution, and Wyo. Const. art. 1, §§ 6 and 11, require that statements also must be voluntary. *Lewis [v. State]*, 2002 WY 92, ¶ 18, 48 P.3d [1063,] 1068 [ (Wyo.2002) ]; *Mitchell v. State*, 982 P.2d 717, 721 (Wyo. 1999); *Doyle v. State*, 954 P.2d 969, 971–72 (Wyo.1998).

*Gunn v. State*, 2003 WY 24, ¶¶ 7–11, 64 P.3d 716, 719–20 (Wyo.2003).

[¶ 20] Even if we were to assume, for purposes of this appeal, that the appellant was in custody during the relevant time period, the key consideration in the instant case remains whether Officer Burns or Sergeant Hadlock interrogated him. We have said that *Miranda's*

"safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. * * * [I]nterrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily on the perceptions of the suspect, rather than the intent of the police."

*Doyle v. State*, 954 P.2d 969, 972 (Wyo.1998) (*quoting Daniel v. State*, 644 P.2d 172, 176 (Wyo.1982)).

[¶ 21] It does not appear from the record that either officer subjected the appellant to express questioning, or its functional equivalent. Rather, it appears that the appellant spontaneously requested to speak with DCI and Sergeant Hadlock simply asked the ap-

pellant about that request. Officer Burns testified, in pertinent part, as follows:

> Q. [The prosecutor] All right. Now, after ... you completed your search of Mr. Grissom, what did you do with him?
>
> A. [Officer Burns] He was placed in the cage portion of my patrol car.
>
> Q. Is that in the back seat?
>
> A. Yes.
>
> Q. All right. And what, if anything, did he tell you or say to you, ask of you?
>
> A. The only thing that he told me is he wanted to talk to DCI.
>
> Q. All right. When he told you that, what did you do?
>
> A. I informed my sergeant of that. And my sergeant came over and asked him the same question—or, you know, asked him about that. And he made the same statement to him.
>
> Q. That he wanted to talk to DCI?
>
> A. Yes.
>
> Q. All right. And so what did you or Sergeant Hadlock do to help out on that request?
>
> A. Used the cell phone from the sergeants' car to call up to the DCI office, which in turn, [Deputy] Wilhelm responded to the [hotel].

Deputy Wilhelm contacted the appellant, advised him of his *Miranda* rights, and proceeded to interview him.

[¶ 22] On appeal, the appellant asks that we presume that his request to speak with DCI *"must have* included a degree of questioning for [the request] to be executed" and while "the record does not reveal the reasons he *must have* given the officer for this desire, they *must have* been sufficiently believable to inspire the officer to pass on the request to his superior, and for the sergeant to make the call and get DCI down to the" scene. (Emphasis added.) This is just the sort of speculation that is forbidden by the applicable standard of review. We conclude that the appellant has not demonstrated that a suppression motion based on this alleged *Miranda* violation would have been granted because it does not appear that the appellant was subjected to express questioning, or its

functional equivalent, prior to being advised of his *Miranda* rights.

### *Sufficiency of the Evidence*

[¶ 23] The appellant asserts that the evidence received at trial was insufficient to prove that he possessed methamphetamine with the specific intent to deliver that methamphetamine. According to the appellant, the facts proved possession, but not possession with intent to deliver, because law enforcement "did not observe the completed act of delivery, nor did they have any evidence of a present intention on the part of [the appellant] to deliver any controlled substance [that he actually possessed] to another person." The appellant characterizes the evidence as indicating that he "had a methamphetamine habit, a relatively small amount of methamphetamine, and had divided that methamphetamine up into several very small amounts, all of which he kept in his own fanny pack, along with the paraphernalia needed to use it himself."

[¶ 24] Our standard of review is as follows:

> When reviewing an appeal based on sufficiency of the evidence, we view the evidence, and any applicable inferences based on the evidence, in a light most favorable to the State. *Nixon v. State*, 994 P.2d 324, 329 (Wyo.1999); and *see Pool v. State*, 2001 WY 8, 17 P.3d 1285 (Wyo.2001). In conducting such a review, we do not substitute our judgment for that of the jury; rather, we determine whether a quorum of reasonable and rational individuals would, or even could, have found the essential elements of the crime were proven beyond a reasonable doubt. *Id.*

*McFarlane v. State*, 2001 WY 10, ¶ 4, 17 P.3d 31, 32 (Wyo.2001). *See also Leyo v. State*, 2005 WY 92, ¶¶ 11–16, 116 P.3d 1113, 1116–18 (Wyo.2005).

[¶ 25] "To be convicted of possession with the intent to deliver a controlled substance under Wyo. Stat. Ann. § 35–7–1031, the State must present sufficient evidence that 1) the defendant possessed, 2) with the intent to deliver, 3) a controlled

substance." [8] *Thomas v. State*, 2003 WY 53, ¶ 18, 67 P.3d 1199, 1204 (Wyo.2003). " 'The intent-to-deliver element may be proven by a showing that a completed delivery occurred or that the defendant held the specific intent to deliver the controlled substance.' " *Hughes v. State*, 2003 WY 35, ¶ 25, 65 P.3d 378, 385 (Wyo.2003) (*quoting Urrutia v. State*, 924 P.2d 965, 968 (Wyo.1996)). Circumstantial evidence, "which is 'proof of facts and circumstances from which the main fact to be proved reasonably follows according to common experience of mankind,' is sufficient to establish the elements of a crime." *Saldana v. State*, 846 P.2d 604, 620 (Wyo.1993) (*quoting Murray v. State*, 671 P.2d 320, 328 (Wyo. 1983) and *Russell v. State*, 583 P.2d 690 (Wyo.1978)) (evaluating the sufficiency of the evidence regarding Saldana's "intent to deliver").

[¶ 26] We find that the record contains sufficient evidence, when viewed in a light most favorable to the State, from which a jury reasonably could infer that the appellant intended to deliver the methamphetamine found in his possession. The appellant, who had admittedly purchased methamphetamine earlier in the day, was present in a hotel room with two females to "get high" and to "party." When the police arrived, the appellant exhibited a "look of fear," retrieved something from a table, and fled the hotel room. A fanny pack subsequently seized from the appellant's person contained methamphetamine and marijuana, and it does not appear that any other controlled substances (with which to "get high" or to "party") were discovered in the hotel room, in the possession of either female present therein, or in Syverson's vehicle.

[¶ 27] The appellant's fanny pack also contained items consistent with the use of methamphetamine and marijuana, as well as items consistent with an intent to deliver the methamphetamine. Deputy Wilhelm [9] testified at length regarding the significance of these items in light of his training and experience. We will summarize the portions of his testimony relevant to whether the appellant intended to deliver the methamphetamine in his possession:

1. Ninety-five to ninety-nine percent of methamphetamine traffickers also use methamphetamine.

2. In determining whether someone intended to distribute a particular controlled substance, the deputy generally looks for the presence of multiple baggies of small quantities of the substance, scales, surplus unused packaging, and records of drug sales and buys.

3. A "person that uses methamphetamine for personal use has no reason to weigh out the methamphetamine" and "no reason to have it separated into several different small baggies." Instead, the person would keep the methamphetamine in "one concentration" and "cut it off and use what they want off of the main baggie;" it is "not common" for a user to cut a quantity off and put it in smaller packages for a "premeasured dose."

4. Likewise, scales are used to "weigh out the product" and the scale seized from the appellant's fanny pack (which scale contained suspected methamphetamine residue) was "consistent with what is found in drug trafficking." Someone "trafficking the drug would buy one quantity [of the drug] ... and then would break that up into" separate, smaller quantities for resale.

5. When a quantity of methamphetamine is broken down into smaller quantities for resale, multiple unused baggies (112 of which baggies were seized from the appellant's fanny pack) are used to package these smaller individual quantities. A person purchasing

8. The district court instructed the jury that the elements of the crime were "On or about the 19th day of September, 2003;" "In Natrona County, Wyoming;" "The Defendant, John Michael Grissom;" "Possessed a controlled substance, to wit: methamphetamine;" "With intent to deliver it to another person."

9. Deputy Wilhelm testified that he was an eight-year veteran of the Natrona County sheriff's office who: (1) had been assigned to the drug task force "to investigate drug crimes to become familiar with the drug trade;" (2) had "received training from the Federal Government and along with the State Government on investigating drug crimes, packaging evidence, interview, techniques;" and (3) had investigated "close to a hundred" drug-trafficking crimes, ninety of which crimes involved methamphetamine.

methamphetamine solely for personal use would not need extra baggies because the person would continue to use the drug from one concentration maintained in its original packaging.

6. Razor blades are used to divide a quantity of methamphetamine into smaller quantities, and to mix other substances with a quantity of methamphetamine (or "cut" it) for resale (thereby increasing the quantity to be sold and the purchase price).

7. The notebook seized from the appellant's person contained indicia of a "pay owe" sheet. A "pay-owe" sheet is "a record of purchases and drug debt which one person might owe another person for the purchase of drugs."

8. It is fairly common for "drug traffickers to have cell phones."

9. The appellant stated that he had already arranged to purchase a quarter-ounce of methamphetamine later that day and trade [10] it to another individual. One can reasonably infer from this statement that the appellant was not merely a methamphetamine user.

The jury obviously accepted and relied upon this testimony, and the appellant raises no appellate issue concerning the propriety of such testimony.

[¶ 28] When we view the evidence in the instant case in the light most favorable to the State, as we must, the evidence clearly is sufficient to prove the "intent to deliver" element of the crime charged. While the appellant emphasizes other inferences which one might make based on the evidence, we have said that even though "other inferences may be drawn from the evidence presented, the trier of fact has the responsibility to resolve conflicts in the evidence." *Wetherelt v. State*, 864 P.2d 449, 452 (Wyo.1993).

[¶ 29] We affirm.

---

**10.** Deputy Wilhelm testified that controlled substances are not always sold for money; they are frequently traded for "anything with value."