DAVIS, Chief Justice.
[¶1] Justin Bittleston appeals his convictions of one count each of felony stalking and burglary. He claims that statements he made during a traffic stop should have been suppressed because he was not given a Miranda warning, and that his counsel was ineffective for having failed to move for their suppression. He further contends that the district court abused its discretion under W.R.E. 403 by admitting body camera footage of the stop. Lastly, he contends that the evidence was insufficient to support his convictions. We affirm.
ISSUES
[¶2] Mr. Bittleston presents five issues on appeal, which we summarize and restate as follows:
1) Was Mr. Bittleston denied effective assistance of counsel when his counsel failed *1290 to move to suppress statements he made without a Miranda warning?
2) Should the district court have suppressed the statements Mr. Bittleston made without a Miranda warning sua sponte?
3) Did the district court abuse its discretion in admitting body camera footage of Mr. Bittleston's traffic stop?
4) Were Mr. Bittleston's convictions supported by sufficient evidence?
[¶3] The State responds to those issues and presents an additional question of whether Mr. Bittleston waived his Miranda claim by failing to raise it before the district court.
FACTS
[¶4] Justin Bittleston and Kelley Skinner met on January 11, 2017 at the Beacon Club in Natrona County, where Ms. Skinner worked as a night manager and bartender. The two immediately began an intimate relationship, and he lived in her home for the next month and a half, aside from a week during that period when they were separated. On February 26, 2017, Ms. Skinner ended the relationship and removed Mr. Bittleston's belongings from her home. She broke the news to him while they were in her car, and he threw her house keys to the vehicle floor.
[¶5] Within an hour, Mr. Bittleston began sending Ms. Skinner text messages, and over the next two weeks, he sent hundreds of those messages and also left numerous voicemails. Ms. Skinner described the text messages as follows:
Q. Was he texting you the same kind of things after you broke up that he was before?
A. No.
Q. How were they different?
A. Threatening, derogatory, disrespectful, mean.
Q. Do you remember any specific language of these texts that were happening early on?
A. "Language" as in?
Q. The contents of the texts.
A. Yeah. Just asking me if this is what I wanted to do. You're going to be sorry. You better make sure that this is what you want. Calling me names.
Q. What names?
A. Cunt, whore, slut, you know, bitch, whatever, you know.
And then he would turn around and say, I love you. I don't want to do this. And then he would say, you - you know, You fucking whore. And it just would go from one - from nice to not nice, you know, back and forth.
Q. Now, when this was happening, were you responding to these texts?
A. At first, I was, because I told - I didn't want him bothering me anymore.
Q. So what would you say in your response?
A. I was just, like, You need to leave me alone. This is crazy. Stop texting me. You know, I can't sleep. You're affecting my work. You're affecting my job. Everything. It was affecting everything.
[¶6] On March 4, 2017, Mr. Bittleston sent Ms. Skinner a text message in which he told her he knew about "Ryan," and who he was. Ryan was a man Ms. Skinner had met on Facebook after her breakup with Mr. Bittleston.[1] Ms. Skinner then became concerned that Mr. Bittleston had been in her home, because the only place he could have seen the name was in her personal journal, which was kept there, and she had not made the journal entry until after her breakup with him. Because Ms. Skinner was at work when she received the text message, she contacted her best friend, Shawn McMillan, and asked her to call the police and check her home. Ms. McMillan did so, and the responding officers found no signs of forced entry but offered to walk Ms. Skinner through her home when she got off work.
[¶7] As promised, the officers met Ms. Skinner at her home after she completed her shift, and she walked through it with them. She did not notice anything out of place, and the officers left and she went to bed. After she went to bed, it occurred to her that she should check her journal. When she did so, *1291 she found that the page of which Mr. Bittleston had sent her a photo had been torn from the journal. On looking further, she also discovered that tip money and a key fob for her vehicle were also missing.
[¶8] The next day, Ms. Skinner had a friend change the locks on her home. While that was being done, Mr. Bittleston drove by Ms. Skinner's home twice, went around the block, and then pulled up and parked behind the friend's vehicle on the street. Mr. Bittleston stayed there for a couple of minutes, and Shawn McMillan, who was also present, contacted the Evansville Police Department.[2] Sergeant Norman Newsome responded, took Ms. Skinner's report, and reviewed some of the text messages Mr. Bittleston had sent her. The text message he later recalled was one in which Mr. Bittleston called Ms. Skinner a whore and told her she would be sorry. Sergeant Newsome advised Ms. Skinner where she could go to obtain a restraining order and then patrolled the immediate area.
[¶9] On March 10, 2017, Mr. Bittleston sent Ms. Skinner numerous text messages,[3] with the last two of the night stating, "You laough all you want my turn now," and "The last mother fucker about died so laough all you want." On March 11, 2017, he again sent her numerous text messages, with the first of the morning stating, "What not so funny now." Other messages on the 11th included: "I got a new toy just for the occasion to;" "I can not wait;" "Peak a boo I see you;" "That's the question were am I at and when;" "I like my new toy;" "Bad mother fucker it is it is;" "Your loss and my gain maybe ill find a loyal woman;" "Cant wait to use my new toy oh boy oh boy this is gonna rock;" "That's right i am going to do just as i said watch its coming your a liar and now I know;" "I will do just as i said;" "Just time now;" "Unfaithful no loyalty bitch;" "My turn no;" and "Watch."
[¶10] On March 12, 2017, Mr. Bittleston sent his first text to Ms. Skinner at 7:43 a.m. It stated, "Good morning is it today." This was followed by, "its ok if not im not going a damn place tell its done," which was sent at 8:34 a.m., and "It will be done to," which was sent at 8:50 a.m. That same morning, Ms. McMillan was on her way to see Ms. Skinner and saw Mr. Bittleston drive by Ms. Skinner's home. Ms. McMillan contacted the Evansville Police Department and reported the sighting.
[¶11] Officer Brandy Parmely took the call, which she considered a suspicious activity call, at about 8:30 that morning, and she patrolled the area for the gold Nissan Mr. Bittleston was reported to be driving. She did not see the vehicle, and she then contacted Ms. McMillan, who gave her a general idea of what had gone on between Ms. Skinner and Mr. Bittleston. She then contacted Ms. Skinner and asked her to come in for an interview, and she attempted to contact Mr. Bittleston but was unable to reach him by phone.
[¶12] Later that same morning, Officer Parmely reopened the suspicious activity call when she saw Mr. Bittleston's gold Nissan in a store parking lot in Evansville. Because she was stopped on a nearby highway and not able to immediately reach the location of Mr. Bittleston's vehicle, she asked Natrona County Sheriff's Deputy Melanie Hoffman, who was patrolling in the area, to stop the vehicle so she could talk to Mr. Bittleston. At that point, Mr. Bittleston was on a side road traveling southbound, and Deputy Hoffman was traveling northbound. To stop Mr. Bittleston's vehicle, Deputy Hoffman pulled into his lane with her hood and rear lights activated.
[¶13] When Officer Parmely arrived, she activated her body camera. She then approached Mr. Bittleston's vehicle and spoke with him while he remained in the vehicle. From the time she activated the camera to the time she ended the contact with Mr. Bittleston, a total of two minutes and thirty-two seconds passed. During that time, Officer Parmely asked him if he had sent Ms. Skinner a thousand text messages in the last couple of weeks, and he nodded and responded, "Yeah." She stated that he had threatened *1292 to kill Ms. Skinner, and he denied that and said he would not hurt her, but he found a love letter on her kitchen table and it was the other guy he wanted to hurt. Officer Parmely told Mr. Bittleston that the text messages were not appropriate, and she warned him to have no further contact with Ms. Skinner and not to drive by her home or Ms. McMillan's home. He agreed that he would not. Nonetheless, at 5:58 that evening, Mr. Bittleston sent Ms. Skinner a text message that stated, "It wont be long at all."
[¶14] On July 31, 2017, the State filed an information charging Mr. Bittleston with one count of felony stalking and one count of burglary. The defense filed a motion in limine arguing that the body camera footage of Mr. Bittleston's traffic stop should be excluded pursuant to W.R.E. 403. The district court found that the video was not unnecessarily cumulative, and that its probative value was not outweighed by its potential for unfair prejudice.
[¶15] Following a three-day trial, a jury found Mr. Bittleston guilty of both the felony stalking and burglary counts, and the district court thereafter sentenced him to concurrent prison terms of three to six years on each count. Mr. Bittleston filed a timely notice of appeal to this Court.
DISCUSSION
[¶16] Because Mr. Bittleston's sufficiency of the evidence claims provide background that is helpful to our discussion of his other claims, we begin there. We will then address his ineffective assistance, suppression, and abuse of discretion claims.
A. Sufficiency of the Evidence
[¶17] In reviewing a sufficiency of the evidence claim, we
decide whether any rational trier of fact could have found that the essential elements of a charged crime were proven beyond a reasonable doubt on the evidence presented. In doing so, we assume that the State's evidence is true, disregard any evidence favoring the defendant, and give the State the benefit of every favorable inference that may reasonably be drawn from the evidence. We will not reweigh the evidence or re-examine witness credibility. Because direct evidence of intent is rare, and circumstantial evidence is most often the only proof available, we have held that intent may be proven by circumstantial evidence alone.
Jones v. State , 2019 WY 45, ¶ 28, 439 P.3d 753, 762 (Wyo. 2019) (quoting Jones v. State , 2017 WY 44, ¶ 34, 393 P.3d 1257, 1264-65 (Wyo. 2017) ).
1. Burglary Conviction
[¶18] "A person is guilty of burglary if, without authority, he enters or remains in a building, occupied structure or vehicle ... with intent to commit theft or a felony therein." Wyo. Stat. Ann. § 6-3-301(a) (LexisNexis 2017). Concerning the evidence required to sustain a burglary conviction, we have said:
The possession of stolen goods alone is not sufficient evidence to convict for burglary. King v. State , 718 P.2d 452, 453 (Wyo.1986) (quoting Newell v. State , 548 P.2d 8, 13 (Wyo. 1976) ). However, we have also concluded with regard to burglary that, " 'the most significant and material evidence of defendant's guilt is his possession of the stolen property. Possession is a strong circumstance tending to show guilt and only slight corroborative evidence of other inculpatory circumstances is required' " to convict. Sutherland v. State , 944 P.2d 1157, 1161 (Wyo. 1997) (quoting Newell , 548 P.2d at 13 ).
Pena v. State , 2015 WY 149, ¶ 12, 361 P.3d 862, 865-66 (Wyo. 2015) (brackets omitted) (quoting McGarvey v. State , 2002 WY 149, ¶ 14, 55 P.3d 703, 706 (Wyo. 2002) ).
[¶19] As to the showing that Mr. Bittleston had possession of an item stolen from Ms. Skinner's home, the evidence was sufficient. One of the items Ms. Skinner found missing was a page from her personal journal, and Mr. Bittleston sent her a text message containing what Ms. Skinner identified as a photo of the missing page. Additionally, he sent her a text message stating, "i got your love note." A rational trier of fact could certainly have found that possession was proved beyond a reasonable doubt.
*1293 [¶20] The record also contains sufficient evidence to satisfy the requirement of slight corroboration. First, the journal page was an unusual item for someone to take, and Mr. Bittleston had a unique motive to do so. The record is replete with evidence that he was angry about Ms. Skinner's decision to end their relationship, and that he immediately began sending her text messages in which he alternately called her names and asked her to reconsider the breakup. His continuing focus on her and pursuit of a romantic relationship was evidence of his motive to take the journal page, and a rational trier of fact could have viewed that motive as corroborative. See Mraz v. State , 2016 WY 85, ¶ 21, 378 P.3d 280, 286 (Wyo. 2016) (citing motive as type of corroborating evidence); Newell v. State , 548 P.2d 8, 13-14 (Wyo. 1976) (citing defendant's drug-seeking motive as corroborating evidence of his burglary of pharmacy).
[¶21] Additional corroboration is found in Ms. Skinner's testimony that she did not make the entry that was torn from her journal until one or two days after the couple's breakup. This precludes the possibility that Mr. Bittleston could have obtained the note at a time when he was authorized to be in the home. Also, although Ms. Skinner testified that Mr. Bittleston threw his copy of her housekey to the floor of her vehicle, she also testified that when she went to retrieve the key, it was not there. A rational trier of fact could infer from the key's absence that Mr. Bittleston recovered it and thus was able to unlawfully enter Ms. Skinner's home. Finally, in response to Mr. Bittleston's text message that he had her love note, Ms. Skinner responded that he had just admitted to breaking into her home. In response, he did not deny the accusation but instead stated, "You we[r]e told day one so fuck you." A rational trier of fact could reasonably expect that Mr. Bittleston would deny the accusation, if it were untrue, rather than respond in a way that suggests the victim got what she deserved.
[¶22] We have explained that corroborating evidence need not be conclusive to sustain a burglary conviction.
Our review of the record revealed that the State also provided testimony that a shoe print found at one burglary site had a sole design similar to a shoe known to belong to Mr. Ferguson. The expert witness conceded he "could not come to a definitive conclusion" that the impression was Mr. Ferguson's footprint. A definitive conclusion was not required, however, only slight corroborative evidence. The State also points out that Mr. Ferguson came to Cheyenne and started staying at Mr. Soriano's house at the same time the burglaries began. It also asserts that the sheer number of stolen items in Mr. Ferguson's possession indicates that he did not come by them coincidentally, and the odd nature and minimal value of the items made it unlikely that anyone but the burglar would have found them desirable enough to steal and collect. Taken separately, each of these bits of evidence fails to prove that it was Mr. Ferguson who committed the burglaries. Taken together, the evidence amounted to at least slight corroboration that Mr. Ferguson had burgled the many stolen items in his possession.
Ferguson v. State , 2007 WY 157, ¶ 12, 168 P.3d 476, 480 (Wyo. 2007).
[¶23] We reach the same conclusion in this case. The corroborating evidence did not conclusively establish that Mr. Bittleston unlawfully entered Ms. Skinner's home, but taken together, it amounted to at least slight corroboration.[4] Taken together, there was sufficient evidence for a reasonable jury to find him guilty of the charge of burglary beyond a reasonable doubt.
*1294 2. Stalking Conviction
[¶24] The statute Mr. Bittleston was charged with violating provides, in relevant part:
(a) As used in this section:
(i) "Course of conduct" means a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose;
(ii) "Harass" means to engage in a course of conduct, including but not limited to verbal threats, written threats, lewd or obscene statements or images, vandalism or nonconsensual physical contact, directed at a specific person that the defendant knew or should have known would cause:
(A) A reasonable person to suffer substantial emotional distress;
(B) A reasonable person to suffer substantial fear for their safety or the safety of another person; or
(C) A reasonable person to suffer substantial fear for the destruction of their property.
(b) Unless otherwise provided by law, a person commits the crime of stalking if, with intent to harass another person, the person engages in a course of conduct reasonably likely to harass that person, including but not limited to any combination of the following:
(i) Communicating, anonymously or otherwise, or causing a communication with another person by verbal, electronic, mechanical, telegraphic, telephonic or written means in a manner that harasses;
(ii) Following a person, other than within the residence of the defendant;
(iii) Placing a person under surveillance by remaining present outside his or her school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant; or
(iv) Otherwise engaging in a course of conduct that harasses another person.
Wyo. Stat. Ann. § 6-2-506 (LexisNexis 2018 Supp.).[5]
[¶25] Stalking is a specific intent crime. Dean v. State , 2014 WY 158, ¶ 10, 339 P.3d 509, 512 (Wyo. 2014) (citing Luplow v. State , 897 P.2d 463, 468 (Wyo. 1995) ). That means the prosecution must prove that a defendant, with the intent to harass, engaged in a course of conduct reasonably likely to harass. Dean , ¶ 10, 339 P.3d at 512. "Specific intent to cause the particular harm may be proven by reasonable inferences from the character of the conduct and surrounding circumstances." Id . (citing Leavitt v. State , 2011 WY 11, ¶ 10, 245 P.3d 831, 833 (Wyo. 2011) ).
The mind of an alleged offender may be read from his acts, his conduct, his words and the reasonable inferences which may be drawn from the circumstances of the case. To hold otherwise would create an impossible burden in a case requiring a finding of specific intent.
Jones v. State , 2012 WY 82, ¶ 27, 278 P.3d 729, 736 (Wyo. 2012) (quoting Schiefer v. State , 774 P.2d 133, 135 (Wyo. 1989) ).
[¶26] Mr. Bittleston does not dispute that the State proved that Ms. Skinner felt threatened by his actions. He instead contends that the State failed to prove specific intent; that is, that he intended to harass Ms. Skinner and cause her substantial emotional distress or substantial fear. We disagree.
[¶27] Ms. Skinner and Ms. McMillan both testified that over the course of about two weeks, Mr. Bittleston sent Ms. Skinner more than seven hundred text messages. In the small percentage of messages admitted into evidence, those sent between March 9, 2017 and March 12, 2017, Mr. Bittleston called Ms. Skinner a pathetic slut, a dumb bitch, a lying cunt, a whore, and an unfaithful no loyalty bitch.[6]
*1295 [¶28] In addition to the malicious name-calling, Mr. Bittleston sent messages stating, from earliest to last (typos in original): "Tic toc mother fucker;" "Your fucked;" "I got big plans;" "watch this shit i dont lie;" "Watch and learn a hard lesson;" "Hope you understand what i said day fucking one;" "Tic toc;" "Ill get it done don't you worry;" "Just a matter of time;" "I was real about it;" "You were told;" "No just watch and see;" "Matter of time;" "Your on my time now not a good place to be;" "Tic toc tic toc;" "Bye bitch;" "Its my turn now;" "Watch;" "You did it now like i said my turn bye im done talking;" "Can't say i didn't tell you i did strongly even repeated it to you so now it is what it is;" "The last mother fucker about died so laough all you want;" "I got a new toy just for the occasion to;" "I can not wait;" "Peak a boo i see you;" "Thats the question were am i at and when;" "No you were just flat out told you dumb bitch;" "I like my new toy;" "Bad mother fucker it is it is;" "Cant wait to use my new toy oh boy oh boy this is gonna rock;" "Thats right i am going to do just as i said watch its coming your a liar and now i know;" "I will do just as I said;" "Poor baby starts the shit then she don't wanna play well to late now you know i didn't say nothing about it cause i thought you might get smart and do me right but no your not that bright you think your cool but your not;" "My turn thow;" "Watch;" "Good morning is it today;" "its ok if not im not going a damn place tell its done;" "It will be done to;" and "It wont be long at all."
[¶29] The State also presented evidence that Mr. Bittleston came to Ms. Skinner's home and workplace, and he followed her while she was driving. We need not delve into that evidence, however, because from the menacing content of the text messages admitted into evidence alone, a rational trier of fact could reasonably infer that Mr. Bittleston intended to cause Ms. Skinner substantial emotional distress and substantial fear. The evidence was thus sufficient to show Mr. Bittleston's specific intent and to sustain his conviction.
B. Ineffective Assistance of Counsel
[¶30] We turn next to Mr. Bittleston's claim that trial counsel was ineffective for failing to file a motion to suppress statements he made to Officer Parmely and Deputy Hoffman during the March 12 traffic stop. Mr. Bittleston contends the questioning was a custodial interrogation and that he therefore should have been given a Miranda warning.[7] We reject the ineffectiveness claim.
[¶31] An ineffective assistance of counsel claim presents mixed questions of law and fact and is reviewed de novo. Dixon v. State , 2019 WY 37, ¶ 56, 438 P.3d 216, 236 (Wyo. 2019) (quoting Castellanos v. State , 2016 WY 11, ¶ 95, 366 P.3d 1279, 1304 (Wyo. 2016) ). "To prevail on an ineffective assistance claim, a defendant must show that his trial counsel rendered constitutionally deficient performance and that absent that deficiency, a reasonable probability exists that he would have enjoyed a more favorable verdict." Wall v. State , 2019 WY 2, ¶ 39, 432 P.3d 516, 527 (Wyo. 2019) (citing Larkins v. State , 2018 WY 122, ¶ 62, 429 P.3d 28, 43 (Wyo. 2018) ). "Where a claim of ineffectiveness rests on counsel's failure to file a suppression motion, prejudice can be shown only by demonstrating that the motion would have been granted, thereby leaving the prosecution with little unsuppressed evidence to support a conviction." Lemley v. State , 2016 WY 65, ¶ 14, 375 P.3d 760, 764 (Wyo. 2016) (citing Grissom v. State , 2005 WY 132, ¶ 12, 121 P.3d 127, 132-33 (Wyo. 2005) ). We may decide an ineffectiveness claim on either the performance or prejudice prong. Wall , ¶ 39, 432 P.3d at 527.
A failure to "make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."
*1296 Strickland v. Washington , 466 U.S. 668, 700, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Indeed, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id . at 697, 104 S.Ct. 2052.
Grissom , ¶ 13, 121 P.3d at 133. Mr. Bittleston's claim is one that is properly decided on the prejudice prong.
[¶32] With respect to the burglary charge, Mr. Bittleston claims prejudice from his statement during the traffic stop that he found the journal page that was taken from Ms. Skinner's home on her table, thereby admitting that he had unlawfully entered her home. Had a motion to suppress been filed and granted, however, the prosecution would not have been left without evidence to support his burglary conviction. As we discussed above, the evidence, even without Mr. Bittleston's statement during the traffic stop, was sufficient to show that he had possession of the journal page taken from Ms. Skinner's home, and to provide the required slight corroboration. We therefore find counsel's failure to file a motion to suppress did not prejudice Mr. Bittleston's defense of the burglary charge.
[¶33] The same is true with respect to the stalking charge. Mr. Bittleston claims his statements during the traffic stop prejudiced his defense to this charge because he admitted sending Ms. Skinner a thousand text messages over a two-week period. As with the burglary charge, however, even if a motion to suppress had been granted, the prosecution had ample evidence to support his conviction. First, Ms. Skinner and Ms. McMillan testified without objection that he sent Ms. Skinner more than seven hundred text messages, so the excessive quantity was in evidence regardless of Mr. Bittleston's statement. Additionally, as we also discussed above, even just the one hundred plus text messages admitted at trial were sufficient evidence of Mr. Bittleston's course of conduct and intent to harass Ms. Skinner.
[¶34] Because the evidence was sufficient to sustain Mr. Bittleston's burglary and stalking convictions without the statements Mr. Bittleston argues should have been excluded, we find no prejudice from counsel's failure to file a motion to suppress. We therefore need not address whether trial counsel's performance was deficient.[8]
C. Miranda Claim
[¶35] Mr. Bittleston next asks this Court to address the merits of his Miranda claim for the first time on appeal. We decline.
[¶36] W.R.Cr.P. 12(b)(3) requires that a motion to suppress be made before trial, and if a pretrial motion is not made, appellate review is precluded. Rodriguez v. State , 2019 WY 25, ¶ 33, 435 P.3d 399, 409 (Wyo. 2019). The only exception to this bar is a showing of good cause for the failure to file the required pretrial motion. Id . ¶ 38, 435 P.3d at 411. "If 'the record reveals no impediment to the defendant's ability to have raised the issue prior to appeal,' good cause for failing to raise the issue in a timely manner cannot be found." Id. ¶ 40, 435 P.3d at 411 (quoting United States v. Augustine , 742 F.3d 1258, 1266 (10th Cir. 2014) ); see also United States v. Baker , 713 F.3d 558, 561 (10th Cir. 2013) (good cause will be found lacking if record shows that sufficient information was available to defense counsel before trial to enable him to frame suppression argument).
[¶37] The video recording of Mr. Bittleston's traffic stop was made available to him early in the case when the State made its initial disclosures, and the record contains nothing to suggest an impediment to filing a motion to suppress and conducting an evidentiary hearing on the Miranda claim. We thus conclude that there was no good cause for Mr. Bittleston's counsel's failure to file a pretrial motion, and that appellate review of his claim is precluded by the rule.[9]
*1297 D. Admission of the Video Recording under Rule 403
[¶38] In his final claim of error, Mr. Bittleston contends the district court erred in denying his motion in limine to exclude the body camera footage of his traffic stop. He argues that the evidence should have been excluded pursuant to W.R.E. 403 because it had little or no probative value and that value was outweighed by its potential for unfair prejudice.
[¶39] We review rulings on the admissibility of evidence for an abuse of discretion. Farrow v. State , 2019 WY 30, ¶ 52, 437 P.3d 809, 823 (Wyo. 2019). "We afford considerable deference to a trial court's rulings on the admissibility of evidence, and we will not disturb the trial court's ruling if there is a legitimate basis for it." Id ."Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." Moser v. State , 2018 WY 12, ¶ 40, 409 P.3d 1236, 1248 (Wyo. 2018) (quoting Triplett v. State , 2017 WY 148, ¶ 23, 406 P.3d 1257, 1262 (Wyo. 2017) ). "For us to conclude that a trial court abused its discretion in weighing evidence under W.R.E. 403, 'the appellant must show that the testimony has little or no value and that it was extremely inflammatory or introduced solely for the purpose of inflaming the jury.' " Hill v. State , 2016 WY 27, ¶ 37, 371 P.3d 553, 564 (Wyo. 2016).
[¶40] Mr. Bittleston contends the body camera footage had no probative value because it was cumulative, and because it contained statements by Officer Parmely about the text messages that were untrue. As to the cumulative nature of the video, Mr. Bittleston argues that Officer Parmely was available to testify concerning his statements during the stop, and since the video added nothing to that testimony, it had no probative value. As to Officer Parmely's statements on the video concerning the text messages, he argues that because she had not seen the text messages when she questioned him, her statements to him that he threatened to kill Ms. Skinner, that what she read was different from what he was saying, and that the text messages were inappropriate, were all untrue and therefore had no probative value. Mr. Bittleston further argues that the footage was unfairly prejudicial because Officer Parmely's accusation that he threatened to kill Ms. Skinner made his actions seem more egregious than the evidence at trial supported and her accusation that what he was saying was different than what she read in the text messages made him seem dishonest.
[¶41] The district court rejected Mr. Bittleston's arguments as a basis for excluding the traffic stop footage. It reasoned:
First, it would seem, even under [defense counsel's] argument, that the officer or officers would be able to testify to their interaction with the defendant in relation to the stop in the absence of the video. If *1298 that's the case, I don't see much in the way of additional prejudice by playing the video if the State seeks to do so. I don't think it's unnecessarily cumulative. And, obviously, it's very brief.
[Defense counsel] would no doubt cross-examine the officer or officers about their interaction and statements made in that regard in relation to their direct testimony. That same cross-examination would obviously also address the issues that were raised with respect to comments that were made during the video; for example, alleged misstatements of evidence, things like that. I think that would happen either way and could certainly happen if the video were played very specifically with the witnesses.
[¶42] While we do not entirely agree with the district court's reasoning, we find no abuse of discretion in the admission of the body camera footage. We part with the court's reasoning to some extent, because in the absence of the video's admission, we do not believe Officer Parmely's statement that the text messages were inappropriate or her statement that Mr. Bittleston was telling her something different from what she read in the text messages would have been admitted. She might have been permitted to testify that she asked Mr. Bittleston if he threatened to kill Ms. Skinner and that he denied the accusation, but she would not have been able to testify that his response was inconsistent with the text messages.[10] Still, we conclude the video had at least marginal probative value and that its value was not outweighed by its potential for unfair prejudice.
[¶43] The video contained Mr. Bittleston's agreement that he had sent around a thousand text messages in a two-week period, which corroborated Ms. Skinner's testimony that he sent 800 to 900 messages, and Ms. McMillan's testimony that she had seen in excess of 700 messages from him on Ms. Skinner's phone. It therefore had probative value. See 1 McCormick on Evidence § 185 (7th ed. June 2016 update) (footnote omitted) ("A fact that is 'of consequence' is material, and evidence that affects the probability that a fact is as a party claims it to be has probative force."). As to the cumulative nature of the evidence, we have said:
There is no rule limiting the number of witnesses a party may call on a particular fact or issue. W.R.E. 403 permits a trial court to exclude relevant evidence for "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This rule is to be used sparingly, because it excludes evidence which is concededly relevant and probative. Towner v. State , 685 P.2d 45, 49 (Wyo. 1984).
Strickland v. State , 2004 WY 91, ¶ 24, 94 P.3d 1034, 1046 (Wyo. 2004) (quoting Mintun v. State , 966 P.2d 954, 959 (Wyo. 1998) ).
[¶44] The video lasted two and a half minutes, and thus did not unduly delay the trial or waste time. Additionally, we cannot say that hearing Officer Parmely testify to Mr. Bittleston's responses is the same for a jury as watching and hearing the responses from him. See Christopher B. Mueller and Laird C. Kirkpatrick, 1 Federal Evidence § 4:15 (4th ed. July 2018 update) ("When proof offered on a point is different in character or persuasive impact from other proof, the former is not merely cumulative of the latter."). We therefore agree with the district court that the evidence was not unnecessarily cumulative.
[¶45] The next question is whether the evidence's potential for unfair prejudice outweighed its probative value. We again agree with the district court that it did not.
[¶46] First, the video was only a couple of minutes in length, contained no displays of emotion, and ended with Officer Parmely letting Mr. Bittleston go. Against the entirety of the record, it had a limited impact, particularly in light of the tone and content of the one hundred-plus text messages admitted into evidence. As to Officer Parmely's misstatements about having read the text messages and about what they said, defense counsel had the opportunity, which he used, *1299 to show that she had not read the text messages, and that none of the text messages she eventually did read contained a direct threat to kill Ms. Skinner. Finally, we note that the video shows Mr. Bittleston denying the accusation that he threatened to kill Ms. Skinner and adding that he would not hurt her-statements he was able to have the jury hear without subjecting himself to cross-examination.
[¶47] Because the body camera footage had probative value and that value was not outweighed by its potential for unfair prejudice, we find no abuse of discretion in the district court's ruling on Mr. Bittleston's motion in limine.
[¶48] Affirmed.

The Facebook contact turned out to be a scam, and no such individual actually exists.

Ms. Skinner lived in Evansville, a town in Natrona County northeast of Casper.

The text messages contain numerous typographical errors, and we have quoted them verbatim without correcting those errors.

Mr. Bittleston focused his argument on the types of corroborative evidence discussed in McGarvey v. State , 2002 WY 149, 55 P.3d 703 (Wyo. 2002), such as a defendant's use of stolen property as his own, opportunity, and proximity to the property unlawfully entered. McGarvey did not, however, suggest that such evidence was either the exclusive or the required way of proving corroboration. The slight corroboration showing we have upheld here is thus not undermined by the State's failure to show that Mr. Bittleston was in proximity of Ms. Skinner's home when her property was taken or by the State's failure to show that Mr. Bittleston used her property as his own.

This statute was amended in 2018, but the relevant provisions quoted herein were not changed.

At one point after her breakup with Mr. Bittleston, Ms. Skinner contacted the Evansville Police Department about the text messages she was receiving, and she was instructed to preserve them. In her attempt to do so by downloading them, she accidentally deleted several hundred of the messages. She did not again attempt a download and instead retained the text messages that Mr. Bittleston continued to send on her phone. Those were the text messages admitted into evidence.

The phrase "Miranda warning" refers to the right to be advised of the constitutional rights to remain silent and have counsel before being subjected to a custodial interrogation. Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Because a W.R.A.P. 21 hearing was not requested below, the facts surrounding the traffic stop and interrogation, and counsel's decision to forego a suppression motion, were not fully fleshed out. We therefore would have been somewhat constrained in our ability to evaluate Mr. Bittleston's claim of deficient performance if that were necessary.

There is a practical reason for this rule. As we observed in Rodriguez , it is unfair to the State to rule on a suppression claim first raised on appeal, at a point when the State has no opportunity to make a record to defend against the claim. Rodriguez , ¶ 36, 435 P.3d at 409. This case illustrates the difficulty created by the resulting sparse record. While a traffic stop supported by a reasonable suspicion of criminal activity is generally considered an investigative detention, we recognize that there may come a point in a stop when questioning shifts from an investigative detention to a custodial interrogation. Rodriguez v. State , 2018 WY 134, ¶ 27, 430 P.3d 766, 772 (Wyo. 2018). Our primary consideration in making that determination is the coercive nature of circumstances surrounding the questioning. Id. ¶ 28, 430 P.3d at 772-73. It is also helpful, however, to know the reasons for the traffic stop itself so as to better assess whether the questioning shifted from an investigative detention to a custodial interrogation. This is where we find the record lacking. We do not know why Officer Parmely reopened the earlier suspicious activity call. We know from her testimony that she spotted Mr. Bittleston's vehicle in a store parking lot, though not parked in a parking space. We do not know if she saw this as an opportunity to question Mr. Bittleston or if his location made her suspicious that he was engaged in stalking activities. Her first question of Mr. Bittleston, "So what are you doing in Evansville," suggests a suspicion as to his activities at the time of the stop, but that was not fleshed out in the record. We think it reasonable to assume that had the State been defending against a suppression motion, the nature of the stop and questioning would have been carefully explored. In short, a timely filed suppression motion would have given both parties an opportunity to fully develop the record we would require to assess the Miranda claim, and in the absence of good cause for the failure to file the required pretrial motion, we will not consider the claim.

Officer Parmely had not read the text messages, and the evidence shows that no such express threat can be found in them.