# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 158

### OCTOBER TERM, A.D. 2014

**December 9, 2014**

TRENT BREON DEAN,

Appellant
(Defendant),

v.

S-14-0094

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
The Honorable Thomas T.C. Campbell, Judge

*Representing Appellant:*

Office of the Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Mr. Morgan.

*Representing Appellee:*

Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; Darrell D. Jackson, Faculty Director, A. Walker Steinhage, Student Director, Kelly Owen, Student Intern, Prosecution Assistance Program. Argument by Ms. Owen.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KITE, Justice.**

[¶1]  A jury found Trent Breon Dean guilty of felony stalking, for stalking his victim in violation of a protection order.  He appeals his conviction and sentence, claiming the district court improperly instructed the jury concerning the elements of the crime of stalking and the State did not present sufficient evidence to establish that he acted with the requisite intent.  We affirm.

## ISSUES

[¶2]  The issues for our determination are:

>    1.     Whether sufficient evidence was presented to establish that Mr. Dean intended to harass the victim.

>    2.     Whether the jury was properly instructed concerning the elements of the crime of stalking.

## FACTS

[¶3]  The Laramie County Attorney's Office charged Mr. Dean by information on August 8, 2012, with stalking his estranged wife in violation of a protection order issued July 27, 2012, pursuant to Wyo. Stat. Ann. §§ 7-3-508 and 7-3-509 (LexisNexis 2013).  The affidavit of probable cause attached to the information stated that Mr. and Mrs. Dean were married but separated pending resolution of divorce proceedings filed by Mrs. Dean.  It further stated that Mr. Dean had been previously convicted and sentenced to prison for felony domestic violence against Mrs. Dean and she feared further violence as a result of having filed for divorce.  The affidavit stated that in a conversation with Mr. Dean on July 26, 2012, Mrs. Dean told Mr. Dean that his behavior made her fearful and she felt like he was a "ticking time bomb."  After this conversation, Mr. Dean went to his wife's office and left a clock and two notes on her desk.  Based on this event and Mr. Dean's past behavior, Mrs. Dean's supervisors called security and the building where she worked was locked down.  During the lock down, Mr. Dean made repeated telephone calls to Mrs. Dean's office.

[¶4]  Later, someone tried to break into Mrs. Dean's home and she called the police.  The police found evidence that someone had tried to enter the home by removing a fan placed in an open window.  Mrs. Dean subsequently applied for and, after a court hearing, obtained a protection order pursuant to §§ 7-3-508 and 7-3-509 prohibiting Mr. Dean from contacting her.  The order was entered on July 27, 2012.  Despite the protection order, Mr. Dean continued to call and send text messages to Mrs. Dean.  On July 31, 2012, police arrested Mr. Dean for violating the protection order.  He continued to make

1

telephone calls to Mrs. Dean from the detention center where he was being held, making fifty-six calls in seven days.

[¶5]   The statute Mr. Dean was charged with violating provides in relevant part as follows:

### § 6-2-506. Stalking; penalty.

(a) As used in this section:
  (i) "Course of conduct" means a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose;
  (ii) "Harass" means to engage in a course of conduct, <u>including but not limited to</u> verbal threats, written threats, lewd or obscene statements or images, vandalism or nonconsensual physical contact, directed at a specific person or the family of a specific person, <u>which the defendant knew or should have known would cause a reasonable person to suffer substantial emotional distress,</u> and which does in fact seriously alarm the person toward whom it is directed.

(b) Unless otherwise provided by law, a person commits the crime of stalking if, <u>with intent to harass another person, the person engages in a course of conduct reasonably likely to harass that person, including but not limited to any combination of the following</u>:
  (i) Communicating, anonymously or otherwise, or causing a communication with another person by verbal, electronic, mechanical, telegraphic, telephonic or written means in a manner that harasses;
  (ii) Following a person, other than within the residence of the defendant;
  (iii) Placing a person under surveillance by remaining present outside his or her school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant; or
  (iv) Otherwise engaging in a course of conduct that harasses another person.
                . . . .
(e) A person convicted of stalking under subsection (b) of this section is guilty of felony stalking punishable by imprisonment for not more than ten (10) years, if:
                . . . .

2

(iv) The defendant committed the offense of stalking in violation of a temporary or permanent order of protection issued pursuant to W.S. 7-3-508 or 7-3-509, or pursuant to a substantially similar law of another jurisdiction.

[¶6] At trial,[1] the instructions the district court gave the jury included the following:

### Instruction No. 9

The elements of the crime of Stalking, as charged in this case are:
1. On or about the 30th day of July, 2012 through the 7th day of August, 2012,
2. In Laramie County, Wyoming
3. [Mr.] Dean
4. With the intent to harass [Mrs.] Dean
5. While engaged in a course of conduct reasonably likely to harass [Mrs.] Dean
6. [Mr. Dean] committed the acts set forth in paragraphs 4 and 5 in violation of a stalking protection order.

### Instruction No. 10

As used in Instruction No. 9, "course of conduct" means a pattern of conduct consisting of a series of acts over any period of time which demonstrates a continuity of purpose.

### Instruction No. 11

As used in Instruction No. 9, "harass" means to engage in a course of conduct, including but not limited to verbal threats, written threats, vandalism or nonconsensual physical contact, directed at a specific person or the family of a specific person, which the defendant knew or should have known would cause a reasonable person to suffer substantial emotional distress, and which does in fact seriously alarm the person toward whom it is directed.

---

[1] This was Mr. Dean's second trial on this charge. The jury was unable to reach a unanimous verdict in the first trial and the district court declared a mistrial and set the case for a new trial. On appeal from the judgment and sentence entered after the second trial, we consider only the record from the latter trial.

## Instruction No. 12

As used in Instruction No. 9, "order of protection" means a temporary or permanent order issued by a Court ordering a person to refrain from acts of stalking involving another person or persons.

[¶7] The jury found Mr. Dean guilty of felony stalking. The district court sentenced him to a term of incarceration of nine to ten years. Mr. Dean timely appealed his conviction and sentence.

## DISCUSSION

### 1. Sufficiency of the Evidence

[¶8] We begin our discussion by considering the sufficiency of the evidence because a finding that the evidence was insufficient to support the conviction would require remand to the district court for entry of an acquittal. *Mraz v. State*, 2014 WY 73, ¶ 10, 326 P.3d 931, 934-35 (Wyo. 2014), citing *Ken v. State*, 2011 WY 167, ¶ 17, 267 P.3d 567, 572 (Wyo. 2011). Our review is governed by the following standards:

> [W]e examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant. We do not substitute our judgment for that of the jury; rather, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt.

*Mraz*, citing *Ken* ¶ 19, 267 P.3d at 572.

[¶9] As set out in paragraph 5 above, in order to sustain a conviction for the crime of felony stalking under § 6-2-506 the State had to prove beyond a reasonable doubt that Mr. Dean, with the intent to harass Mrs. Dean, engaged in a course of conduct reasonably likely to harass her in violation of the protection order. Mr. Dean contends the State failed to prove beyond a reasonable doubt that he acted with the intent to harass. Rather, he argues, the evidence showed only that he acted with the intent to show his wife that he loved her and wanted to save his marriage. The State responds that sufficient circumstantial evidence was presented from which the jury could infer that Mr. Dean intended to harass Mrs. Dean within the meaning of the statute.

[¶10] Section 6-2-506(b) requires a specific intent to harass. *Luplow v. State*, 897 P.2d 463, 468 (Wyo. 1995). That is, it requires proof that a defendant, with the intent to

4

harass, engaged in a course of conduct reasonably likely to harass. Specific intent to cause the particular harm may be proven by reasonable inferences from the character of the conduct and surrounding circumstances. *Leavitt v. State,* 2011 WY 11, ¶ 10, 45 P.3d 831, 833 (Wyo. 2011).

[¶11] Under § 6-2-506(e)(iv), the "course of conduct" necessary for a felony stalking conviction may encompass acts of harassment occurring prior to the issuance of an order proscribing contact with the victim. *Walker v. State*, 2013 WY 58, ¶ 24, 302 P.3d 182, 189 (Wyo. 2013) (*Walker II*). The evidence presented by the State, accepted as true for the purpose of determining its sufficiency, showed that in July of 2012, prior to issuance of the protective order, Mr. and Mrs. Dean were living apart and Mrs. Dean had filed for divorce. On July 20, 2012, Mrs. Dean allowed Mr. Dean to stay at her house so they could take the children to the Cheyenne Frontier Days parade the next day. Mr. Dean had been drinking heavily and fell asleep in her bed. Because he was drunk, rolling around the bed and snoring, Mrs. Dean lay down on the couch in the front room. Mr. Dean woke up in the middle of the night and was angry with her for not being in bed with him. He accused her of being with another man in the front room and began looking under the couch and in the kitchen cabinets. Mrs. Dean told him that she wanted to take him back to the house where he had been staying. He went after her. She ran into the kitchen, called 911 and grabbed a knife. Mr. Dean proceeded to ransack the bedroom and the children's rooms. The police arrived and, after being threatened with a taser, Mr. Dean agreed to leave. After he left, he made repeated telephone calls to Mrs. Dean. Mrs. Dean testified that she was scared that night, ranking her fear on a scale of one to ten at "nine plus."

[¶12] The next day, Mr. Dean continued to call and text Mrs. Dean from different phones. In one of the texts, he said he had stolen Mrs. Dean's debit card and I.D. and told her to come and get them. Mrs. Dean testified that she was too scared to go herself so she drove her two older children to within a block of the house where Mr. Dean was staying and sent them to retrieve the documents. Mr. Dean sent Mrs. Dean repeated texts, including one telling her that he was angry that she had not come to retrieve her things herself. Mr. Dean called and texted Mrs. Dean the next day as well. Even though she did not see him that day, she testified that she was scared because she did not know whether he was watching her or what his state of mind was.

[¶13] On Monday, July 23, 2012, Mr. Dean began calling Mrs. Dean at work first thing in the morning. When Mrs. Dean did not answer, Mr. Dean came to her office building. A receptionist brought Mrs. Dean a note indicating that a man was there to take her to lunch. She was on a business call and, knowing the man was likely Mr. Dean, tried to hurry it along so that she could leave her office before he came there. She testified she was scared of him and felt threatened by his repeated phone calls and having him show up at her office. Before Mrs. Dean was able to end the call, the receptionist brought Mr. Dean to her office and he sat in a chair while she finished the call. Afterward, Mrs. Dean

went outside with Mr. Dean and told him she was moving ahead with the divorce and not to come to her office. He told her that he owned her and was not going to lose her.

[¶14] The following day, Mr. Dean again started calling Mrs. Dean at work. When she did not answer, he left messages saying he would come to her office if she did not take his call. Around 11:30 or noon, Mr. Dean showed up in her office with lunch. So as not to make a scene, Mrs. Dean ate lunch with him in her office, then walked him to the front door and told him not to come to her office, to leave her alone and to go home and wait to be served with the divorce papers. Mr. Dean began yelling and cussing and told Mrs. Dean he was not afraid of the police. Mrs. Dean went back inside the building because two women were standing there and she thought Mr. Dean would not do anything to her with them there. Mr. Dean continued to call and text Mrs. Dean through the rest of the day. She testified, "it was very intimidating the way he was coming at me." She also testified that she took his statement about not being afraid of the police to mean he was not afraid to do whatever he wanted to her.

[¶15] The next day, July 25, 2012, Mrs. Dean took the day off from work to take her kids to Cheyenne Frontier Days activities. That afternoon while they were out, Mr. Dean called and said he was watching her, described what she was wearing and listed the places she had been in the order that she had been there. Mrs. Dean testified that she "was scared to death" upon hearing Mr. Dean had been watching her without her knowledge. She started crying and told the kids they all needed to go home. She stayed home that evening and did not take the kids to the carnival like she normally did on Cheyenne Day because she was too scared and did not feel safe going. She testified that on a scale of one to ten, her fear of Mr. Dean that day was at a ten.

[¶16] The following day, Mrs. Dean parked her vehicle a couple of blocks away from the office parking lot and walked to her office, hoping that if Mr. Dean did not see her vehicle he would think she was not at work and would not come to her office. As with the other days that week, Mr. Dean began calling and texting her first thing in the morning. Finally, Mrs. Dean went outside and answered a call from him, hoping that if he heard her talking outside he would think she was not at work. Mr. Dean had been served with the divorce papers that morning and told Mrs. Dean he was going to check himself in to inpatient rehabilitation, get counseling for anger management and start working and going to church. Mrs. Dean told him she was moving forward with the divorce and to seek treatment for his own well-being, not in the hope of getting them back together. She told him about a thought process chart she had seen at a recent counseling session that went from "somewhat responsible behavior" to "somewhat irresponsible" to "irrational" to "a walking time bomb." She told Mr. Dean that he matched the description of the walking time bomb on the chart. Mr. Dean responded that he would leave her alone and would sign the divorce papers.

[¶17] Based on Mr. Dean's statements, Mrs. Dean believed he would not come to her office and that everything would be okay. She went back to her office and met with her boss, telling her that a meeting scheduled with the division administrator to discuss concerns about Mr. Dean was no longer necessary, he was getting help and would not be a problem in the future. As she was talking with her boss, Mrs. Dean learned that Mr. Dean was in the building, was angry and was heading toward her office carrying a bag. Mrs. Dean was scared about what Mr. Dean might do and she and her boss left her office and went to a nearby stairwell where Mrs. Dean's boss made some calls from her cell phone. As a result, the building was locked down and law enforcement arrived. Meanwhile, Mr. Dean had gone to Mrs. Dean's office and left a clock and two notes on her desk. When Mrs. Dean returned to her office later, she saw the clock and the notes, which said, "Love, your husband" and "I love you so, so, so much." There was also a voicemail message on her phone from him, saying "I see you had to leave early." She thought Mr. Dean was trying to intimidate her and that the clock related to their earlier conversation about him being a walking time bomb. She thought the notes meant he was not going to let her go. The clock was set for 5:48. Not knowing whether Mr. Dean had set the clock for that time as an indication that something was going to happen then, Mrs. Dean stayed at her office with police until after 6:00 p.m.

[¶18] That night around 11:00 p.m., Mrs. Dean heard a banging noise in her kitchen. She went into the kitchen and saw someone outside in the dark punching the fan in the window above the sink. She grabbed the fan, shut and locked the window and called the police. Mrs. Dean was convinced the intruder was Mr. Dean. When the police arrived, they discovered motion lights on the side of the house were unscrewed, the screen on the window had been cut and the fan was damaged. Mrs. Dean testified that after the events of that day and night, she "was scared to death" and concerned for her personal safety and that of her children.

[¶19] The following day, Mrs. Dean completed the paperwork for obtaining a protection order. Mr. Dean was served and a hearing was convened that afternoon. Mr. and Mrs. Dean testified. Based on the testimony, the judge granted the protection order prohibiting Mr. Dean from contacting Mrs. Dean.

[¶20] Mrs. Dean testified that on the day she obtained the protection order, she was fearful for her life. Mr. Dean had said he was not going to lose her, would not let anyone else have her and would not let her be happy with anyone else. She feared he would go to any extreme. She "was afraid he was going to do something to physically hurt me really bad or kill me." Mrs. Dean testified that even after she obtained the protection order, her fear about her personal safety remained at a level ten.

[¶21] The next day, Mr. Dean texted Mrs. Dean, saying he was sorry and asking her to come by or call so they could talk. She testified she was still concerned for her personal safety despite the protection order. She and a neighbor formulated a plan that she would

7

have her keys with her at all times while she was in her house so that if something happened she could activate her car alarm and the neighbor would know to call the police. When it was dark, Mrs. Dean stayed in the hallway in the interior of her home so Mr. Dean could not see her if he was looking in the windows.

[¶22]  On Sunday, July 29, 2012, Mrs. Dean continued to receive texts from Mr. Dean. She kept the doors and windows closed and would not let the younger children play outside for fear Mr. Dean would come by. The next day Mrs. Dean received a phone call at work from an unknown number during which the caller breathed into the phone and said nothing.

[¶23]  The following day, on July 31, 2012, Mrs. Dean went home from work mid-morning and found a board from her porch broken off. Someone had placed two pennies heads side up on the board. Mrs. Dean testified that she was too scared to go into the house and went straight to the police department. She testified that she was afraid the board and the two pennies were some type of death threat left by Mr. Dean.

[¶24] Mrs. Dean called work from the police department and learned that a detective was at her office wanting to talk with her. Mrs. Dean went to her office and while she was talking with the detective, Mr. Dean left a message on her office voicemail. He called again after the detective left Mrs. Dean's office. Mrs. Dean was "scared to death that he was going to do something to me" and reported the call to the detective. Police arrested Mr. Dean and charged him with stalking.

[¶25]  After his arrest, Mr. Dean repeatedly called Mrs. Dean from jail and left messages. In one message, he told her the charges were being dismissed and he was getting out of jail. Mrs. Dean was on a business trip and, after hearing what Mr. Dean said, accepted his call to find out what was going on so she could make plans to take the kids and leave if Mr. Dean was in fact getting out of jail. Mrs. Dean testified that she "was afraid for her life" and her kids' safety.

[¶26]  From the above evidence, we conclude the State met its burden of proving beyond a reasonable doubt that Mr. Dean intended to harass Mrs. Dean. From the evidence, a jury could reasonably infer that he intended to engage in a course of conduct reasonably likely to harass Mrs. Dean, including but not limited to verbal threats, written threats, vandalism or nonconsensual physical contact, which he knew or should have known would cause a reasonable person to suffer substantial emotional distress. Taking the State's evidence as true, Mr. Dean physically threatened Mrs. Dean and ransacked the bedrooms in her home on one occasion. On another occasion he followed and watched her and her kids without their knowledge and then called and described what she was wearing, where they had been and in what order they had been there. After a discussion in which Mrs. Dean referred to him as a walking time bomb, Mr. Dean left a clock on her office desk set at a time shortly after she got off work. He attempted to break into Mrs.

8

Dean's house late at night. He repeatedly called and texted her and showed up at her office despite having been told to leave her alone. He yelled and cussed at her, and told her she belonged to him and that he was not going to lose her, would not let anyone else have her and would not let her be happy with someone else.

[¶27] After Mrs. Dean obtained the protection order on July 27, 2012, Mr. Dean continued to call and text her. From the character of Mr. Dean's conduct and the surrounding circumstances, the jury could reasonably infer that he also went to her house after the protection order was issued, damaged her porch and left a symbolic "heads up" sign for her to find. The jury could also reasonably infer that Mr. Dean engaged in this course of conduct intentionally knowing that it would cause, or which he should have known would cause, a reasonable person to suffer substantial emotional distress.

[¶28] Mr. Dean argues that his intent was not to harass Mrs. Dean but only to let her know he loved her and to try to save the marriage. His argument is unpersuasive given the State's evidence. To reiterate, Mr. Dean physically threatened Mrs. Dean, ransacked her home and left only when police arrived and produced a taser. He followed and watched her without her knowledge and then called her to tell her what she was wearing and where she had been. Despite Mrs. Dean's repeated requests that he not come to her office, he showed up there three days out of the four she worked the last full week of July, 2012. He yelled and cussed at her, said he would not let her go, attempted to break into her home, damaged her front porch and left items at her office and her home suggesting she should beware. At the same time he was engaging in this course of conduct, he called and texted her again and again and again. The State presented sufficient evidence to prove beyond a reasonable doubt that Mr. Dean intended to harass Mrs. Dean.

## 2. Jury Instructions

[¶29] Mr. Dean's second contention is that the district court committed reversible error when it failed to instruct the jury that under § 6-2-506(b)(i) through (iv), the "course of conduct" element of the crime of stalking includes, but is not limited to,

> any combination of the following:
> (i) Communicating, anonymously or otherwise, or causing a communication with another person by verbal, electronic, mechanical, telegraphic, telephonic or written means in a manner that harasses;
> (ii) Following a person, other than within the residence of the defendant;
> (iii) Placing a person under surveillance by remaining present outside his or her school, place of employment,

vehicle, other place occupied by the person, or residence other than the residence of the defendant; or

(iv) Otherwise engaging in a course of conduct that harasses another person.

Mr. Dean argues this statutory language means that in order to find him guilty of stalking the jury was required to find that he committed any combination of the conduct enumerated. Because the district court did not instruct the jury that the crime of stalking required proof that he committed any combination of (i), (ii), (iii) or (iv), Mr. Dean contends, the jury could not have found that he committed any combination of the above acts and was guilty of stalking.

[¶30] Mr. Dean did not object to the instruction challenged on appeal; therefore, we review his contention for plain error. *Walker II*, ¶ 29, 302 P.3d at 190-191, citing *Walker v. State*, 2012 WY 1, ¶ 13, 267 P.3d 1107, 1112 (Wyo. 2012) (*Walker I*). Plain error exists when: 1) the record is clear about the incident alleged as error; 2) the error transgressed a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right which materially prejudiced him. *Id*.

[¶31] The State concedes the jury was not instructed on the language contained in § 6-2-506(b)(i) through (iv) and the first prong of the plain error test is satisfied. Addressing the second prong, the State argues that § 6-2-506(b)(i) through (iv) set forth nonexclusive examples of conduct that constitute stalking; a jury may find a defendant guilty of stalking upon finding he engaged in a course of conduct that harasses within the meaning of § 6-2-506(a); therefore, an instruction that does not include § 6-2-506(b)(i) through (iv) is still a correct statement of Wyoming law. Should this Court conclude otherwise, the State asserts Mr. Dean was not denied a substantial right resulting in material prejudice because it is reasonably likely the jury would have reached the same result if it had been instructed on the language of § 6-2-502(b).

[¶32] Pursuant to § 6-2-502(b), a defendant commits the crime of stalking when, with the intent to harass another person, he engages in a "course of conduct reasonably likely to harass that person." "Conduct reasonably likely to harass" may include any combination of the conduct enumerated in subparagraph (b)(i) through (iv). However, "conduct reasonably likely to harass" is not limited to the enumerated conduct. The provision expressly leaves open the possibility that other types of conduct may constitute "conduct reasonably likely to harass." The State, therefore, is not required to prove a defendant's conduct included the conduct enumerated in subparagraph (b)(i) through (iv) in order to sustain a stalking conviction.

[¶33] The purpose of jury instructions is to "provide the jury with a foundational legal understanding to enable a reasoned application of the facts to the law." *Walker II*, ¶ 31, 302 P.3d at 191, citing *Walker I*, ¶ 13, 267 P.3d at 1112 and *Miller v. State*, 904 P.2d 344,

348 (Wyo.1995). In order to support a reliable verdict, it is crucial that the trial court correctly state the law and adequately cover the relevant issues. *Id.* Ultimately, the test of adequate jury instructions is "whether they leave no doubt as to the circumstances under which the crime can be found to have been committed." *Walker II*, ¶ 31, 302 P.3d at 191, citing *Burnett v. State*, 2011 WY 169, ¶ 14, 267 P.3d 1083, 1087 (Wyo. 2011) (quoting *Bloomfield v. State*, 2010 WY 97, ¶ 15, 234 P.3d 366, 373 (Wyo. 2010).

[¶34] In the present case, the district court instructed the jury as to the elements of the crime of stalking: 1) the intent to harass, and 2) a course of conduct reasonably likely to harass. The district court also instructed the jury on the statutory meaning of the terms "course of conduct" and "harass." The latter definitions informed the jury that to find Mr. Dean guilty of stalking, he had to have engaged in a course of conduct that included, but was not limited to verbal or written threats, vandalism or nonconsensual physical contact directed at Mrs. Dean or her family. These instructions provided the jury with a foundational legal understanding to enable a reasoned application of the facts to the law. They correctly stated the law and adequately covered the relevant issues. They also left no doubt as to the circumstances under which the jury could find that Mr. Dean committed the crime of stalking. While an instruction informing the jury of the other statutory examples of "conduct reasonably likely to harass" might have been helpful, such an instruction was not essential to adequately apprise the jury of the law it was to apply to the facts.[2] We conclude the district court's failure to instruct on the examples of conduct enumerated in § 6-2-506(b)(i) through (iv) did not transgress a clear and unequivocal rule of law. Mr. Dean has not established that plain error occurred.

[¶35] We affirm Mr. Dean's conviction for felony stalking.

---

[2] We are not entirely sure such an instruction would in fact have been helpful. It is just as likely to have confused the jury. Defining the word "harass" to include particular types of conduct in one subsection while, in another subsection, defining the phrase "conduct reasonably likely to harass" to include different types of conduct makes the statute less than clear.