# THE SUPREME COURT, STATE OF WYOMING

## 2024 WY 120

OCTOBER TERM, A.D. 2024

November 20, 2024

EVERETT L. BRAY,

Appellant
(Defendant),

v.

S-24-0105

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Converse County*
*The Honorable F. Scott Peasley, Judge*

*Representing Appellant:*
> *Office of the State Public Defender: Brandon Booth, Wyoming State Public Defender\*; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel.*

*Representing Appellee:*
> *Bridget Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; John J. Woykovsky, Assistant Attorney General.*

> *\*An Order Substituting Brandon Booth for Ryan Roden was entered on October 10, 2024.*

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FENN, Justice.**

[¶1]    A jury convicted Everett Bray of felony stalking in violation of Wyoming Statute § 6-2-506(b)(iv) and (e)(iv)[1] (LexisNexis 2021).  Mr. Bray argues on appeal that the State produced insufficient evidence to prove he had the requisite level of intent required to support his conviction.  We affirm.

## ISSUE

[¶2]    Mr. Bray presents a single issue which we rephrase as follows: Did the State present sufficient evidence to show Mr. Bray had the specific intent to harass his ex-wife?

## FACTS

[¶3]    Mr. Everett Bray and MS met in approximately 2014 and married in May 2016.  In 2019, Mr. Bray was convicted of a domestic violence offense against MS.  While Mr. Bray was serving his sentence, MS divorced him.  Mr. Bray was released from prison on June 1, 2022.  Prior to his release, MS was notified Mr. Bray would be released from prison.  MS and her mother called the Converse County Sheriff's Office and requested Mr. Bray be charged with criminal trespass if he entered either MS's or her mother's adjacent property.

### June 2022 Incident

[¶4]    On June 26, 2022, Mr. Bray and another man went to MS's residence.  MS's roommate answered the door while MS hid in her room.  Mr. Bray asked the roommate if MS was there.  The roommate told Mr. Bray she was not at home, and she might be at her mother's home.  After Mr. Bray left her property, MS called her mother to tell her Mr. Bray was on his way to her house.  MS also called the sheriff's department.

[¶5]    Upon arriving at MS's mother's house, Mr. Bray knocked on her front door.  When no one answered the door, Mr. Bray knocked on the side and back doors and windows.  MS's mother called 911 to report Mr. Bray was on her property.  MS's mother then saw Mr. Bray cut across her backyard, jump her fence, and head back to MS's house.

[¶6]    When Mr. Bray returned to MS's property, MS was agitated and continued to hide from Mr. Bray in her bedroom.  The roommate confronted Mr. Bray from MS's front porch.  Mr. Bray motioned to MS's dog and said, "that's my dog."  The roommate told Mr. Bray the dog was MS's, and he needed to leave the property.  Refusing to leave without the dog, Mr. Bray grabbed the dog and left MS's property through the front gate, closing the front

---

[1] In 2022, the Wyoming Legislature renumbered sub-section (iv) of Wyoming Statute § 6-2-506 as sub-section (v) and added a new sub-section (iv). 2022 Wyo. Sess. Laws 341–42.

1

gate behind him. MS's roommate told Mr. Bray to put MS's dog back inside the gate. Mr. Bray reopened the gate and stated the dog was his. As Mr. Bray reopened the gate, the dog ran back towards MS's house. Mr. Bray then came back inside the gate.

[¶7]    The roommate again told Mr. Bray to leave the property. In response, Mr. Bray said, "Do you know what? I'm here to kill her and her mom and anybody who gets in my way." Mr. Bray looked at a shovel near the gate, so the roommate grabbed the shovel to "get it before [Mr. Bray] did[.]" The roommate held the shovel up over his head and told Mr. Bray to leave. Mr. Bray said "I'm not going anywhere. This is my home. . . . What you want to do? What you want to do? Come on." The roommate told Mr. Bray "I don't want to do this[,]" while holding the shovel up. Mr. Bray responded by rushing towards the roommate and stating, "Well, you're going to have to do something because I'm going to kill you and kill them." The roommate hit Mr. Bray in the head with the shovel, knocking him to the ground.

[¶8]    Law enforcement was dispatched to MS's home for a suspicious incident/trespassing call. A Converse County Sheriff's Deputy arrived on the scene and found Mr. Bray walking along the road away from MS's property. The deputy observed an injury to Mr. Bray's eye. Mr. Bray told the deputy he was there to see his dog and that he fell while climbing the fence at MS's property. The deputy arrested Mr. Bray and cited him for criminal trespass on MS's and her mother's properties.

[¶9]    On June 27, 2022, Mr. Bray entered a no contest plea to criminally trespassing on MS's and her mother's properties, was given a 180-day suspended sentence, and placed on six months of supervised probation. As part of his sentence, Mr. Bray was also ordered to have no contact with MS. On June 30, 2022, MS obtained a protection order against Mr. Bray which was served on Mr. Bray on July 1, 2022. The protection order expires on June 30, 2025. In the protection order, the circuit court ordered Mr. Bray to have no contact with MS and MS's mother and to stay away from their properties.

**January 2023 Incident**

[¶10]   Although Mr. Bray had a protection order against him and was ordered to have no contact with MS, he went back to MS's property in January 2023. Mr. Bray arrived at MS's house in a van with another individual and parked in front of MS's bedroom window. Upon seeing Mr. Bray approach her house, MS grabbed an axe to protect herself and called the sheriff's department. MS spoke with Mr. Bray at her front door where he was standing with a beer in one hand and a shiny object in the other. Mr. Bray told MS he came back to work on their relationship. Concerned that he had been drinking, MS closed the door and continued talking to the sheriff's department on her phone. Mr. Bray reopened the door and let MS's dog outside. While she was on the phone, MS saw Mr. Bray load her dog in the van he arrived in and try to leave her property. Sheriff's deputies arrived as Mr. Bray was trying to leave MS's property and arrested him.

2

[¶11]  Mr. Bray was charged with one count of felony stalking in violation of Wyoming Statute § 6-2-506(b)(iv) and (e)(iv).  After a two-day trial, a jury convicted Mr. Bray of this charge.  The district court sentenced Mr. Bray to 42–84 months in prison.  This timely appeal followed.

## STANDARD OF REVIEW

[¶12]  The standard we use when reviewing a sufficiency of the evidence claim is well established:

> [W]e assume that the State's evidence is true, disregard any evidence favoring the defendant, and give the State the benefit of every favorable inference that may reasonably be drawn from the evidence.  After examining the State's evidence, whether direct or circumstantial, we do not substitute our judgment for that of [the] jury, but instead, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt.  Furthermore, we defer to the jury as the fact-finder, and assume the jury believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt.  Ultimately, our standard of review is not whether the evidence is sufficient for us, but whether, when viewed favorably to the [S]tate, it was enough on which a jury could form a reasonable inference of guilt beyond a reasonable doubt.

*Kobielusz v. State*, 2024 WY 10, ¶ 22, 541 P.3d 1101, 1107–08 (Wyo. 2024) (quoting *Snyder v. State*, 2021 WY 108, ¶ 50, 496 P.3d 1239, 1253 (Wyo. 2021)) (internal quotation marks and citations omitted).

## DISCUSSION

[¶13] Felony stalking is a specific intent crime that requires the State to prove the defendant, with the intent to harass, engaged in a course of conduct reasonably likely to harass another person in violation of a temporary or permanent order of protection. *Bittleston v. State*, 2019 WY 64, ¶ 25, 442 P.3d 1287, 1294 (Wyo. 2019) (citing *Dean v. State*, 2014 WY 158, ¶ 10, 339 P.3d 509, 512 (Wyo. 2014)); Wyo. Stat. Ann. § 6-2-506(b), (e)(iv).  Wyoming Statute § 6-2-506(a)(ii) defines "harass" in relevant part as:

> (ii) "Harass" means to engage in a course of conduct, including but not limited to verbal threats, written threats, lewd or

3

obscene statements . . . directed at a specific person that the defendant knew or should have known would cause:

> (A) A reasonable person to suffer substantial emotional distress; [or]
>
> (B) A reasonable person to suffer substantial fear for their safety or the safety of another person. . . .

A course of conduct is "a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose[.]" Wyo. Stat. Ann. § 6-2-506(a)(i).

[¶14] Mr. Bray argues the State presented insufficient evidence showing he engaged in a course of conduct with the intent to harass MS. He claims a jury could not reasonably conclude he intended to harass MS because his two acts of going to MS's home eight months apart "do not show a continuity of purpose to harass."

[¶15] To support his argument, Mr. Bray relies on *Hawes v. State*, 2014 WY 127, ¶¶ 9–11, 335 P.3d 1073, 1076–77 (Wyo. 2014). In *Hawes*, we reversed the defendant's stalking conviction when there were only two encounters between the defendant and the victim. *Id.* at ¶¶ 10–11, 335 P.3d at 1077. The first encounter between the defendant and the victim was a chance encounter where the defendant happened to be driving in front of the victim. *Id.* at ¶¶ 3–6, 335 P.3d at 1075–76. We found the chance encounter while driving in front of the victim several miles from her home and near a turn-off to the defendant's home failed to support a reasonable inference that the defendant had an intent to harass the victim. *Id.* at ¶ 10, 335 P.3d at 1077. We held from these two encounters there could be no "course of conduct" because the evidence did not support an intent to harass during the first of two encounters. *Id.*

[¶16] Unlike the defendant in *Hawes*, Mr. Bray's contacts with MS cannot reasonably be inferred as chance encounters. At trial, Deputy Vance Kunz with the Converse County Sheriff's Department testified he believed Mr. Bray was notified he was not to trespass onto MS's and her mother's properties prior to the first incident in June 2022. The policy of the sheriff's office is to notify individuals when property owners request them not to trespass on their property, and the department's computer system indicated Mr. Bray had been notified.

[¶17] Despite the warning from the sheriff's department not to trespass on MS's property, Mr. Bray went to MS's property less than a month after he was released from prison. When the roommate told Mr. Bray that MS was not at her home, Mr. Bray went to her mother's house and repeatedly knocked on doors and windows. When Mr. Bray did not find MS at her mother's home, he jumped the fence and returned to MS's property. MS's roommate testified that upon Mr. Bray's return to MS's property he threatened MS and stated he was

4

"[t]here to kill [MS] and her mom and anyone who [got] in [his] way." When questioned by Deputy Kunz as to why he was on MS's property and how he had gotten injured, Mr. Bray claimed he was there to see his dog, and then lied about his injury stating he had fallen while climbing over MS's fence.

[¶18] Following this first incident, Mr. Bray was arrested and convicted of criminal trespass, and, as part of his sentence, he was ordered not to have contact with MS. MS also obtained a protection order against Mr. Bray that specifically prevented him from going to her property. Despite being ordered not to have any contact with MS and to stay away from her property, Mr. Bray went to MS's property a second time. MS testified upon realizing Mr. Bray was on her property, she grabbed an axe to defend herself. She further testified she feared for her safety because Mr. Bray was intoxicated, and his use of alcohol played a role in the past violence between them. Mr. Bray told MS he came back to "work on [their] relationship," to which MS did not respond and instead closed the door. Mr. Bray then opened MS's door without being authorized to do so and attempted to leave MS's property with her dog.

[¶19] As we have continually held, specific intent in felony stalking "may be proven by reasonable inferences from the character of the conduct and surrounding circumstances." *Dean*, 2014 WY 158, ¶ 10, 339 P.3d at 512 (citing *Leavitt v. State*, 2011 WY 11, ¶ 10, 245 P.3d 831, 833 (Wyo. 2011)). "The mind of an alleged offender may be read from his acts, his conduct, his words and the reasonable inferences which may be drawn from the circumstances of the case." *Jones v. State*, 2012 WY 82, ¶ 27, 278 P.3d 729, 736 (Wyo. 2012) (quoting *Wentworth v. State*, 975 P.2d 22, 26 (Wyo. 1999)). Conduct and surrounding circumstances occurring prior to the issuance of an order proscribing no contact with the victim can show a "course of conduct" necessary to support a felony stalking conviction. *Dean*, ¶ 11, 339 P.3d at 512 (citing *Walker v. State*, 2013 WY 58, ¶ 24, 302 P.3d 182, 189 (Wyo. 2013)).

[¶20] Here, Mr. Bray went to MS's home more than once, despite having initially been warned by the sheriff's department and subsequently ordered by a court not to have any contact with MS. During the first incident, Mr. Bray threatened MS and lied to law enforcement. After Mr. Bray was convicted for criminal trespass and a protection order was entered against him, he went to MS's home a subsequent time appearing intoxicated and in a confrontational manner. Viewing the evidence in the light most favorable to the State, a rational jury could find Mr. Bray's course of conduct during the two incidents showed a continuity of purpose, and Mr. Bray intended to harass MS. The State produced sufficient evidence showing Mr. Bray intended to harass MS. *See, e.g.*, *Bittleston*, 2019 WY 64, ¶¶ 26–29, 442 P.3d at 1294–95 (finding there was sufficient evidence to show a specific intent to harass from threatening text messages alone).

## CONCLUSION

[¶21]   The State produced sufficient evidence showing Mr. Bray had the specific intent to harass his ex-wife, which was necessary to convict him of felony stalking.  Affirmed.