# IN THE SUPREME COURT, STATE OF WYOMING

# 2026 WY 49

APRIL TERM, A.D. 2026

April 30, 2026

BRENT DOUGLAS GAYMAN,

Appellant
(Defendant),

v.

S-25-0189

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Park County*
The Honorable Bill Simpson, Judge

*Representing Appellant:*
Office of the State Public Defender: Patricia Bennett, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Sean H. Barrett, Senior Assistant Appellate Counsel.

*Representing Appellee:*
Keith G. Kautz, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Holli J. Welch, Senior Assistant Attorney General.

*Before BOOMGAARDEN, C.J., GRAY, FENN, JAROSH, and HILL, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**JAROSH, Justice.**

[¶1]    A jury convicted Brent Gayman of felony stalking.  On appeal, Mr. Gayman asserts there was insufficient evidence that he had the specific intent to harass his estranged wife.  He also asserts that incidents that occurred prior to entry of a protective order could not serve as the basis for the conviction.  Finding no error, we affirm.

**ISSUE**

[¶2]    Mr. Gayman presents a single issue on appeal which we rephrase as follows:

> Did the State fail to present sufficient evidence of felony stalking?

**FACTS**

[¶3]    Brent Gayman and Rebecca Gayman were married for forty-five years and lived in Cody.  Ms. Gayman contacted law enforcement on June 9, 2024, one day after she left their family residence.  She alleged that on the night she left Mr. Gayman raised his fist to hit her and later threatened to kill the family cats by leaving a voicemail stating they were "going to meet the barrel of a shotgun."  Ms. Gayman interpreted that message to be abusive, threatening, and scary.  Mr. Gayman also sent "angry" text messages containing "threats" to his and Ms. Gayman's daughter, Jessica, who had also left the family's residence the previous night.

[¶4]    As of July 2, 2024, the parties' living arrangements had changed — Ms. Gayman was again living at the family residence, along with Jessica, Jessica's husband, and their children. Mr.  Gayman was staying at a motel.  By this time, Ms. Gayman had served Mr. Gayman with divorce papers.  On July 2, Ms. Gayman observed Mr. Gayman driving back and forth past their residence and again called the police.  That same day, she attempted to procure an emergency restraining order, but the court declined the request and set a hearing for July 5, 2024.  Following the hearing, the court entered a stipulated protection order prohibiting Mr. Gayman from contacting Ms. Gayman, as well as Jessica, her husband, and their children.[1]

[¶5]    The protection order prohibited Mr. Gayman from "directly or indirectly" communicating with Ms. Gayman in person, by telephone or other electronic means, by writing in any form, through third persons, and by nonverbal communication and gestures. The prohibition included "telephone calls, mail, email, texting, fax, contacting through social media, contacting through the internet or similar technology, and any other form of

---

[1] According to the protection order, Mr. Gayman stipulated that an act of domestic violence as defined by Wyo. Stat. Ann. 35-21-102(a)(iii) had occurred.

communication." The order also prohibited Mr. Gayman from being at Ms. Gayman's place of employment or within 200 feet of the family residence. It also stated that Mr. Gayman was ordered "to stay far enough away from those places to avoid upsetting the life of [Ms. Gayman]." In addition, the order prohibited Mr. Gayman from surveilling Ms. Gayman. Finally, the protection order granted sole possession of the family residence to Ms. Gayman during the period the order was in effect.

[¶6] Despite the no contact order, Mr. Gayman continued to drive by the family residence "repeatedly" and at one point parked in the neighbor's driveway less than 200 feet from the residence.[2] On July 28, 2024, Ms. Gayman and her son-in-law believed Mr. Gayman was in their yard at night with a flashlight. They called the police, but no one was found in the yard.

[¶7] Pursuant to the protection order, the court approved the parties' rented garage in Cody as a mutual drop off location for exchanging mail and personal belongings. On July 29, 2024, Jessica and her husband went to the garage to leave items for Mr. Gayman. While there, they discovered several papers taped to the wall. The papers were photocopies of a book cover titled "Anger Management for Men," a workbook titled "Anger Management Workbook for Men," and a book cover titled "Love You, Hate the Porn." Mr. Gayman had annotated the photocopy of the cover of "Love You, Hate the Porn," including with notes that said "I use your picks [sic]" and "Not since I have pics of my beautiful wife to use." When Ms. Gayman later went to the garage with her daughter, Ms. Gayman recognized the writing on the photocopies as Mr. Gayman's. Ms. Gayman and Jessica reported the papers to the police because they believed Mr. Gayman was using them as a means to contact Ms. Gayman.

[¶8] On August 1, 2024, as they were eating dinner, Ms. Gayman and Jessica discovered Mr. Gayman surveilling their residence with binoculars from his pickup on the side of the road. Ms. Gayman reported this to the police, but they did not respond that evening. The next day, on August 2, 2024, near the end of the workday, Jessica contacted Ms. Gayman at work to let her know Mr. Gayman was "circling around the store [where Ms. Gayman worked] … quite a few times" and had "parked [outside]." Jessica would often track Mr. Gayman via the iPad for "[Ms. Gayman's] safety." As Ms. Gayman left work, she asked her employer, Kenneth Lee, to walk her to her vehicle. Ms. Gayman and Mr. Lee saw Mr. Gayman watching them. Ms. Gayman then found a typewritten note on her windshield, which read:

> Becky

---

[2] Ms. Gayman was able to track Mr. Gayman through the iPhone feature that allows users to share their location. Because Mr. Gayman had formerly shared his location with his wife, his location was still observable on her iPad.

I have decide [sic] to end my life at 5 am tomorrow so you can have my life insurance money.

So you will have insurance money to retire on.

I'm sooo VERY sorry you hate me sooo much, and won't give us a chance to reconcile.

I can't heal fast enough to suit you, and I'm sorry.

I won't belabor it.

I have half a months worth of morphine, about 900 mg, I have 60 mg/day, a 5th of bourbon and 96 mph (from my testing) through a guardrail, through a sign and into a lake.

Goodbye, you are the only woman I have truly loved, and still love.

That's why I'm doing it this way, to provide for you because I love you sooo much.

See, I don't need a gun.

Brent.

Although Ms. Gayman did not read the note, Mr. Lee read it and decided they should contact the police. Mr. Lee and Ms. Gayman both saw Mr. Gayman watching them from a nearby parking lot about fifty to sixty yards away, and as she drove toward the sheriff's office, Ms. Gayman noticed Mr. Gayman following her in his pickup.

[¶9] Cody Police Officer Trevor Budd met Ms. Gayman at the Park County Law Enforcement Center where she told Officer Budd about the events from that day and that she had previously reported multiple other violations of the protection order to law enforcement agencies in Park County. Officer Budd verified this information and proceeded to locate Mr. Gayman, who admitted to circling Ms. Gayman's work "not to cause her harm, but simply to watch her." After hearing from Ms. Gayman that Mr. Gayman's course of conduct caused her and her family "substantial emotional distress and substantial fear for their safety," Officer Budd arrested Mr. Gayman for stalking and violation of the protection order.

[¶10] On August 5, 2024, the State filed an Information formally charging Mr. Gayman with one count of felony stalking in violation of Wyo. Stat. Ann. § 6-2-506(b) [and] (e)(iv)

3

2025), and one count of violating a protection order, a misdemeanor, in violation of Wyo. Stat. Ann. § 6-4-404(a) (2025).[3] On April 1, 2025, Mr. Gayman's jury trial began and lasted for three days. The State called Ms. Gayman, Jessica, and Ms. Gayman's employer, Mr. Lee, to testify. The defense did not call any witnesses. Mr. Gayman moved for judgment of acquittal on the stalking charge, arguing his actions were not done with the intent to harass Ms. Gayman. The district court denied his motion. The jury found Mr. Gayman guilty on both counts. The court sentenced him to three to five years in prison, with credit for 329 days, for felony stalking, and six months for violating the protection order, to be served concurrent to the felony stalking sentence.

[¶11]   This appeal followed.

## STANDARD OF REVIEW

[¶12]   In reviewing a sufficiency of the evidence claim, our standard of review is whether the evidence, when viewed in the light most favorable to the State, was enough on which a jury could form a reasonable inference of guilt beyond a reasonable doubt. *Bray v. State,* 2024 WY 120, ¶ 12, 559 P.3d 149, 151 (Wyo. 2024) (quoting *Kobielusz v. State*, 2024 WY 10, ¶ 22, 541 P.3d 1101, 1107-08 (Wyo. 2024) (citation omitted)). We assume the State's evidence is true, disregard any evidence favoring the defendant, and give the State the benefit of every favorable inference that may reasonably be drawn from the evidence. *Id.*

[¶13]   The standard is not whether the evidence is sufficient *for this Court*. *Id.* After examining the State's evidence, whether direct or circumstantial, we do not substitute our judgment for that of the jury, but instead, we determine whether a jury could have reasonably concluded that each of the elements of the crime was proven beyond a reasonable doubt. *Id.* Furthermore, we defer to the jury as the factfinder, and assume the jury believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt. *Id.*

## DISCUSSION

[¶14]   Felony stalking is a specific intent crime in which the State must show the defendant "with intent to harass another person, … engages in a course of conduct reasonably likely to harass another person" in violation of a protection order. *Bray,* ¶ 13, 559 P.3d at 151-52 (citing *Bittleston v. State,* 2019 WY 64, ¶ 25, 442 P.3d 1287, 1294 (Wyo. 2019)); *see also* Wyo. Stat. Ann. § 6-2-506(b) and (e)(iv) (identifying, in relevant part, conduct which constitutes stalking and felony stalking). Under the statute, a course of conduct means "a pattern of conduct composed of a series of acts over any period of time evidencing a

---

[3] The State amended its original Information twice – once on January 31, 2025, and again on February 10, 2025, to insert the correct range of dates for the stalking count.

continuity of purpose[.]" Wyo. Stat. Ann. § 6-2-506(a)(i). Also under the statute, "harass" means to:

> engage in a course of conduct, including but not limited to verbal threats, written threats, lewd or obscene statements or images, vandalism or nonconsensual physical contact, directed at a specific person that the defendant knew or should have known would cause:
>     (A)    A reasonable person to suffer substantial emotional distress;
>     (B)    A reasonable person to suffer substantial fear for their safety or the safety of another person; or
>     (C)    A reasonable person to suffer substantial fear for the destruction of their property.

Wyo. Stat. Ann. § 6-2-506(a)(ii). Examples of stalking include, but are not limited to:

>     (i)    Communicating, anonymously or otherwise, or causing a communication with another person by verbal, electronic, mechanical, telegraphic, telephonic or written means in a manner that harasses;
>     (ii)    Following a person, other than within the residence of the defendant;
>     (iii)    Placing a person under surveillance by remaining present outside his or her school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant;
>     (iv)    Using any electronic, digital or global positioning system device or other electronic means to place another person under surveillance or to surveil another person's internet or wireless activity without authorization from the other person; or
>     (v)    Otherwise engaging in a course of conduct that harasses another person.

Wyo. Stat. Ann. § 6-2-506(b).

[¶15] Although stalking is a specific intent crime, direct evidence is not required to show specific intent. *See Storey,* ¶ 14, 546 P.3d at 1104 (finding while texts may not have contained direct threats of violence or that defendant was watching his victim, their repetitive and malicious nature created a reasonable inference of a specific intent to harass). Instead, specific intent may be proven "by reasonable inferences from the character of the conduct [of the defendant] and surrounding circumstances." *Bray,* ¶ 19, 559 P.3d at 153

(quoting *Dean v. State,* 2014 WY 158, ¶ 10, 339 P.3d 509, 512 (Wyo. 2014)) (citation omitted). Further, "[b]ecause direct evidence of intent is rare, and circumstantial evidence is most often the only proof available, … intent may be proven by circumstantial evidence alone." *Storey*, ¶ 8, 546 P.3d at 1102 (quoting *Fox v. State,* 2020 WY 88, ¶ 9, 467 P.3d 140, 142 (Wyo. 2020)). That evidence can include an offender's acts, conduct, words, and reasonable inferences drawn from the circumstances of the particular case. *See Bray,* ¶ 19, 559 P.3d at 153 (quoting *Jones v. State*, 2012 WY 82, ¶ 27, 278 P.3d 729, 736 (Wyo. 2012)) (citation omitted). "It is the jury's responsibility to resolve conflicts in the testimony, weigh the evidence and draw reasonable inferences from the facts." *Jones v. State*, 2010 WY 44, ¶ 16, 228 P.3d 867, 871 (Wyo. 2010) (citation omitted).

[¶16] Mr. Gayman argues on appeal that the evidence at trial failed to show that he had specific intent to harass or that he engaged in a course of conduct reasonably likely to harass in violation of the protection order. Mr. Gayman relies on *Hawes v. State,* 2014 WY 125, ¶¶ 9-11, 335 P.3d 1073, 1076-77 (Wyo. 2014), where this Court reversed a stalking conviction after finding no "course of conduct." We reasoned the evidence did not support an intent to harass because one of two encounters between the appellant and the victim was a chance encounter. *Id.* We distinguished *Hawes* in *Bray*, where we held two encounters *did* establish a course of conduct and showed a continuity of purpose and intent by the defendant to harass the victim. *Bray,* ¶ 20, 559 P.3d at 153. In *Bray,* the defendant had been warned not to trespass on his victim's property and the victim had obtained a court order against him. *Id.,* ¶ 17-18, 559 P.3d at 152. Nevertheless, he approached the victim's property twice, first threatening to kill the victim and her mother, and then, in a second incident, opening the door of her home without authorization and attempting to take her dog. *Id.,* ¶ 18, 559 P.3d at 152-53. We determined Mr. Bray's actions of approaching the victim's home and threatening her, and then attempting to take her dog, demonstrated a course of conduct that supported the jury's finding of an intent to harass. *Id.,* ¶ 20, 559 P.3d at 153. We noted that specific intent could be inferred from Mr. Bray's conduct and the circumstances surrounding both incidents. *Id.,* ¶ 21, 559 P.3d at 153. Similarly, in *Storey*, we concluded the State's evidence that the defendant made thirty-three calls and sent thirty-nine text messages that included name-calling and offending statements over the course of two days was enough for a jury to find the defendant guilty beyond a reasonable doubt. *Storey,* ¶ 14, 546 P.3d at 1104. We found his actions created a course of conduct sufficient for the jury to infer he specifically intended to harass his victim. *Id.*

[¶17] This case is similar to *Bray* and *Storey*. Mr. Gayman engaged in repeated conduct from which the jury could reasonably infer he intended to harass Ms. Gayman. First, Mr. Gayman's conduct prior to the issuance of the protection order showed a "'course of conduct' necessary to support a felony stalking conviction," including the angry text messages Mr. Gayman sent to his daughter, and his messages to Ms. Gayman threatening the cats. *Bray,* ¶ 19, 559 P.3d at 153 ("Conduct and surrounding circumstances occurring prior to the issuance of an order proscribing no contact with the victim can show a 'course of conduct' necessary to support a felony stalking conviction.")

[¶18]  The events that occurred *after* the entry of the protection order, notwithstanding the prior events, by themselves showed a further "course of conduct" and specific intent to harass necessary to support the stalking conviction.  The evidence at trial was that Mr. Gayman repeatedly drove by Ms. Gayman's residence, parked in a neighbor's yard less than 200 feet from Ms. Gayman's residence, attempted to contact Ms. Gayman through pictures and lewd notes by hanging them up in a rented garage, surveilled Ms. Gayman and her family through binoculars while they were at home eating dinner, circled Ms. Gayman's workplace, watched Ms. Gayman from a nearby parking lot as she was leaving work, and contacted Ms. Gayman by leaving a typewritten suicide note on her vehicle.  Combined, these actions demonstrate a course of conduct that was threatening and was intended to harass.  Most of these events were in direct violation of the protection order, establishing further evidence of Mr. Gayman's intent to harass Ms. Gayman.  Also, Ms. Gayman testified at trial Mr. Gayman's actions were "abusive, threatening, and scary," and Jessica also testified his actions were "frightening."  Viewing the evidence in the light most favorable to the State, a rational jury could have found Mr. Gayman's course of conduct was intended to harass Ms. Gayman and the State produced sufficient evidence showing Mr. Gayman's intent.

## CONCLUSION

[¶19]  The State presented sufficient evidence of felony stalking, including evidence showing Mr. Gayman had the specific intent to harass Ms. Gayman.

[¶20]  Affirmed.

7